v.

**STATE of Utah, Defendant and Appellee.**

**No. 20061106.**

Supreme Court of Utah.

Nov. 7, 2008.

Michael J. Petro, Provo, for plaintiff.

Mark L. Shurtleff, Att'y Gen., Erin Riley, Asst. Att'y Gen., Salt Lake City, for defendant.

## INTRODUCTION

DURRANT, Associate Chief Justice:

¶1 Spencer Houskeeper seeks to have his conviction for attempted rape vacated. Houskeeper claims he is entitled to relief under the Post–Conviction Remedies Act (the "PCRA") because he received ineffective assistance of counsel at a juvenile court retention hearing. As a result of that hearing, Houskeeper was bound over to the district court, tried, convicted, and sentenced as an adult. After unsuccessfully appealing his conviction, he petitioned the district court for post-conviction relief. The district court held a hearing and denied the petition. Houskeeper now appeals that denial, and we must resolve four issues:

1. Whether the district court correctly concluded that the PCRA applies to Houskeeper's claim that he received ineffective assistance of counsel at a juvenile court retention hearing.

2. Whether the district court erred in interpreting *State v. F.L.R. (State ex rel. F.L.R.)*[1] and in denying Houskeeper's petition based on that interpretation.

3. Whether the district court correctly concluded that Houskeeper satisfied the two-prong *Strickland* test for proving he received ineffective assistance of counsel at his juvenile court retention hearing.

4. Whether this court may fashion an appropriate remedy under the PCRA.

¶2 For the reasons detailed below, we grant Houskeeper's petition and order that his record be made expungeable consistent with a juvenile court disposition. After reviewing the applicable background and facts, we will address each of the issues in the order established above.

## BACKGROUND

¶3 Seventeen-year-old Houskeeper and fifteen-year-old Jessica attended high school together. On Saturday evening, November 8, 1997, Houskeeper and Jessica met at a mutual friend's house with several other teens. The group of teens began taking pain medication for recreational purposes, and Houskeeper and Jessica participated. Houskeeper and Jessica then began talking and ended up kissing in the bathroom. Jessica later agreed that she did not object to this. Following their encounter in the bathroom, the two left the party in Houskeeper's car, and Houskeeper drove to a church parking lot and parked.

¶4 The parties disagree about what happened next. Houskeeper claims that the sexual acts that occurred in the car were consensual, while Jessica claims that they were not. Specifically, Jessica claims that she rejected Houskeeper's attempt to perform oral sex on her and that Houskeeper then tried to force her to perform oral sex on him. Jessica also claims that when Houskeeper next penetrated her vagina with his fingers and then with his penis, she told him "no" and that the acts were causing her great pain.

¶5 The parties agree that after the sexual encounter, and while still in the car, Houskeeper saw something red on his pants and asked Jessica if it was lipstick. Jessica believed that it was her blood—based on the amount of pain she felt during the sexual act—but did not tell Houskeeper. Instead, she said she didn't know what the red stains were. Houskeeper then drove Jessica back to the party, and along the way, the two

1. 2006 UT App 294, 141 P.3d 601.

agreed not to tell anyone about the sexual encounter.

¶ 6 Later that evening, Jessica left the party with her friends, to whom she recounted her version of the night's events, including the fact that she had been injured enough during the sexual encounter to cause bleeding. A friend convinced Jessica to seek medical help and drove her to Orem Community Hospital, where a police officer interviewed Jessica. She was then sent to Utah Valley Medical Center in Provo where Dr. Stephen L. Barry conducted a full rape examination.

■ ¶ 7 During his examination, Dr. Barry found "several distinct injuries" consistent with a nonconsensual sexual encounter. As a result of Dr. Barry's examination and Jessica's statement to police, Houskeeper was charged by information with one count of aggravated sexual assault and one count of forcible sodomy, both first degree felonies. Aggravated sexual assault is one of the crimes enumerated in the Serious Youth Offender Act (the "SYOA").[2] The purpose of the SYOA is to create a "strong presumption that cases involving inherently violent and aggressive offenses by juveniles sixteen years of age and older will be transferred to the district court."[3]

¶ 8 Pursuant to the SYOA procedures, the juvenile court held a preliminary retention hearing to determine whether Houskeeper should be bound over to district court to answer the charges as an adult. At the hearing, Houskeeper was represented by his attorney, Michael Esplin. According to the SYOA, the State first had the burden of establishing "probable cause to believe that" Houskeeper committed aggravated sexual assault.[4]

¶ 9 To meet this probable cause burden, the State first called Jessica to recount her version of events. The State then called Dr. Barry, who read from his "Code–R" rape exam report, showed photographs of Jessica's genital injuries, and testified that her injuries were "extremely consistent with a nonconsensual penetrating force." The State also called Dr. Delvin Scott Ensley, who had examined Jessica. He too testified that her "injuries … were consistent with an injury related to an assault."

¶ 10 Because the State met its burden, the burden then shifted to Houskeeper to establish the three retention factors that would allow the juvenile court to retain jurisdiction over him. During the retention hearing, the parties stipulated that the first two retention factors were not at issue; therefore, Houskeeper had the burden of establishing only the third factor—that he did not commit the offense of aggravated sexual assault in a "violent, aggressive, or premeditated manner."[5]

¶ 11 To meet this burden, Houskeeper's attorney, Esplin, presented only his seventeen-year-old client, who testified that he never made oral threats or used any kind of force on Jessica during the sexual encounter. Importantly, Esplin called no medical experts of his own, though he did cross-examine the State's medical experts and questioned them about Jessica's injuries. And he did elicit from the experts an admission that the injuries Jessica suffered could have come from consensual sex, though neither expert would rule out nonconsensual sex as the more likely cause of the injuries.

¶ 12 During closing arguments, which focused on the third retention factor, Esplin briefly reviewed the testimonies of Jessica and Houskeeper. He then correctly cited

2. Utah Code Ann. §§ 78A–6–702 to –703 (Supp. 2008)—renumbered. This section was renumbered but not substantially changed. We therefore cite to the current version of the code.

3. *In re A.B.*, 936 P.2d 1091, 1099 (Utah Ct.App. 1997).

4. Utah Code Ann. § 78A–6–702(3)(a). Of the two crimes charged, only aggravated sexual assault is an enumerated SYOA offense. However, the SYOA grants jurisdiction to district courts to consider all charges against a juvenile who is

bound over on any single SYOA charge. The SYOA provides that "[w]hen a defendant is charged with multiple criminal offenses in the same information or indictment and is bound over to answer in the district court for one or more charges under this section, other offenses arising from the same criminal episode … shall be considered together with those charges." *Id.* § 78A–6–702(7).

5. *Id.* § 78A–6–702(3)(b)(iii).

the only case at the time to have interpreted the third retention factor, *In re A.B.*,[6] for the proposition that even an aggravated crime can be committed with a "low level of violence and aggression," providing an opportunity for defendants to establish the third retention factor. Esplin then noted that during the sexual encounter, Houskeeper used no weapons, created no physical restrictions, and made no threats against Jessica. In attempting to establish the third retention factor, Esplin argued that the incident was "as non-violent a rape as you can have."

¶ 13 The juvenile court disagreed and found that the State met its burden of establishing probable cause that Houskeeper committed aggravated sexual assault and that Houskeeper failed to establish the third retention factor to avoid bindover to district court. The juvenile court then ordered Houskeeper bound over to district court to answer the charges as an adult.

¶ 14 Houskeeper attempted to avoid the bindover through a variety of legal actions. First, he timely appealed the bindover order to the Utah Court of Appeals, but he voluntarily withdrew the appeal.[7] Then, in September 1998, he filed a motion to quash the bindover order, which was denied. Finally, he petitioned this court for interlocutory review, which we denied.[8] Having failed to avoid trial in the district court, Houskeeper was tried to a jury in August 1999, which found him guilty of attempted rape, a first degree felony, but acquitted him of forcible sodomy.[9] The district court sentenced Houskeeper to the statutory prison term of three-years-to-life, suspended the sentence, and imposed 365 days in jail and 36 months probation. The court also fined Houskeeper $1,850. As a result of his conviction, Housk-

eeper was required to register as a sex offender.

¶ 15 Following Houskeeper's conviction, he made a motion to arrest judgment, which was denied. Houskeeper then appealed to this court claiming several errors, including an error in the juvenile court's bindover order.[10] In December 2002, we affirmed Houskeeper's conviction on all issues except the propriety of the bindover order, which we refused to address because Houskeeper voluntarily withdrew his original appeal on that issue and "[c]onsequently, waived his right to appeal the bind over order." [11]

¶ 16 In December 2003, Houskeeper filed a petition in the district court for post-conviction relief under the PCRA. In his petition, Houskeeper asserted ten claims, including that he received ineffective assistance of counsel at the retention hearing. Houskeeper, now represented by new counsel, argued that Esplin was ineffective for failing to mount a meaningful defense regarding the third retention factor. The district court dismissed all of Houskeeper's claims except the ineffective assistance of counsel claim.

¶ 17 In June 2006, after extensive briefing on the ineffective assistance of counsel claim, the district court held an evidentiary hearing on that issue. The court denied Houskeeper's petition, and Houskeeper timely appealed to this court. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (Supp.2008).

## STANDARDS OF REVIEW

■ ¶ 18 In denying Houskeeper's petition, the district court made certain findings of fact and conclusions of law. We review the district court's factual findings for clear

6.  936 P.2d at 1101–02.

7.  *State v. Houskeeper ("Houskeeper I")*, 2002 UT 118, ¶ 3, 62 P.3d 444.

8.  *Id.* ¶ 4.

9.  Prior to deliberations, the trial court instructed the jury that rape and attempted rape were lesser included offenses of aggravated sexual assault.

10.  On his first appeal to this court, Houskeeper raised four issues. He claimed that (1) the dis-

trict court gave an incorrect jury instruction that attempted rape was a lesser included offense of aggravated sexual assault; (2) the district court lacked jurisdiction to sentence him; (3) the juvenile court erred in binding him over to district court; and (4) the district court improperly admitted prior bad acts evidence. 2002 UT 118, ¶ 1, 62 P.3d 444.

11.  *Id.* ¶ 23.

error and review its legal conclusions for correctness.[12]

## ANALYSIS

¶ 19 Our analysis begins with a determination of whether the PCRA applies to Houskeeper's claim. Next, we will address whether the district court erred in interpreting *State v. F.L.R. (State ex rel. F.L.R.)*, and whether it erred in denying Houskeeper's post-conviction petition based on that interpretation. Finally, we will determine whether the district court properly concluded that Houskeeper established that he received ineffective assistance of counsel at his retention hearing, and if so, what remedy this court may appropriately fashion under the PCRA.

## I. THE PCRA APPLIES TO HOUSKEEPER'S CLAIM THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE JUVENILE COURT RETENTION HEARING

¶ 20 The State argues that the PCRA does not apply to Houskeeper's claim for three reasons: first, because of the venue in which Houskeeper claims to have received ineffective assistance of counsel—a juvenile court retention hearing; second, and closely related, because of Houskeeper's age—he is now an adult and thus cannot be returned to juvenile court for a new retention hearing; and third, because of the content of Houskeeper's petition—he does not specifically challenge his conviction or sentence.

¶ 21 In interpreting the PCRA, we seek " 'to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve.' "[13] The best evidence of the legislature's intent is "the plain language of the statute itself."[14] Additionally, "[w]hen examining the statutory language,

we assume the legislature used each term advisedly and in accordance with its ordinary meaning."[15] If, in reading the statute, the meaning of the language is clear, we need look no further to discern the legislature's intent. In this case, the meaning of the PCRA is clear, and we find that it does apply to Houskeeper's claim.

¶ 22 The PCRA provides a "legal remedy for any person" who, after exhausting all other legal remedies, "challenges a conviction or sentence" based on the grounds enumerated in the PCRA.[16] Those grounds include "the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution."[17]

¶ 23 Houskeeper satisfies these criteria. He was convicted of and sentenced for attempted rape. He exhausted his appellate remedies. He then filed a petition for post-conviction relief in the district court claiming he received ineffective assistance of counsel.

¶ 24 The State does not dispute these facts. The State does, however, read additional criteria into the PCRA that would preclude Houskeeper's claim. First, the State reads in a venue exclusion. Second, and closely related, it reads in an age exclusion. The State thus argues that the PCRA "provides no remedy for the claim that counsel was ineffective in a juvenile retention hearing, once the juvenile court has lost jurisdiction and the defendant is an adult."

¶ 25 In making this argument, the State reasons that the PCRA cannot apply to Houskeeper's claim because he cannot return to juvenile court for a new retention hearing. But the PCRA does not limit relief to a replication of the proceeding where the error occurred. If this were the case, an entire class of convicted juvenile criminals would be excluded from relief simply because legal

---

**12.** *State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994).

**13.** *State v. Bluff,* 2002 UT 66, ¶ 34, 52 P.3d 1210 (quoting *Harmon City, Inc. v. Nielsen & Senior,* 907 P.2d 1162, 1167 (Utah 1995)).

**14.** *In re Z.C.,* 2007 UT 54, ¶ 6, 165 P.3d 1206 (citations and internal quotation marks omitted).

**15.** *Id.*

**16.** Utah Code Ann. § 78–35a–102(1) (2002). This section was renumbered in 2008 with substantive changes. Because section 78–35a–102 was in effect when Houskeeper filed his petition, we cite to that section.

**17.** *Id.* § 78–35a–104(1)(d).

proceedings take time, and the petitioners have aged out of the juvenile court system in the interim. While the PCRA does not provide any explicit remedy for the problem of aging out, it does implicitly account for it by providing two possible remedies: a reviewing court may "vacate *or* modify the conviction."[18] Further, if "the court vacates the original conviction or sentence, it shall enter findings of fact and conclusions of law and an *appropriate order*."[19] Thus, the PCRA grants broad discretion to reviewing courts to fashion appropriate remedies.

¶ 26 The State's final argument as to why the PCRA does not apply to Houskeeper's claim is based on the content of his petition. Specifically, the State claims "Houskeeper is not challenging his conviction or sentence" as required by the PCRA.[20] Rather, the State argues, he challenges only the effectiveness of his counsel at the retention hearing. But the ineffectiveness of Houskeeper's counsel at the retention hearing resulted in a harsher sentence. Thus, by the very nature of his claim, Houskeeper challenges his sentence.

¶ 27 Houskeeper claims that if he had received effective assistance of counsel at the retention hearing, he would have been retained in juvenile court. Regardless of the disposition of his case there, his sentence would have been less severe.[21] Additionally, Houskeeper would have had the option of petitioning to expunge his record had he been retained in juvenile court.[22] Because he was convicted in district court of a first degree felony that is also a registerable sex offense, that option is unavailable to him.[23]

¶ 28 In conclusion, because Houskeeper satisfies each of the PCRA's criteria, we hold that the PCRA applies to his claim that he received ineffective assistance of counsel at the juvenile court retention hearing.

## II. THE DISTRICT COURT'S INTERPRETATION OF *STATE v. F.L.R.* WAS ERRONEOUS

¶ 29 Following the June 2006 postconviction evidentiary hearing, the district court denied Houskeeper's petition, not because it concluded that Houskeeper had failed to establish that he received ineffective assistance of counsel, but because its erroneous interpretation of *State v. F.L.R. (State ex rel. F.L.R.)*[24] made Houskeeper's claim moot.

¶ 30 In interpreting *F.L.R.*, the district court found that

the Appeals Court has established a high standard that leaves no wiggle room for defendants to argue that the act they are charged with was not committed in a violent or aggressive manner. In essence, a finding that probable cause exists as to an aggravated offense results in *automatic transfer* to the district court and any argument as to retention factors are [sic] merely ornamental. (Emphasis added.)

Applying this reasoning to Houskeeper, the district court concluded that once the State showed "probable cause" that Houskeeper committed an aggravated offense, his transfer to the district court was "automatic." Thus, Houskeeper's claim that he received ineffective assistance of counsel in establishing the retention factors was moot. In arriv-

---

18. *Id.* § 78–35a–104(1) (emphasis added).

19. Utah R. Civ. P. 65C(m)(1) (emphasis added).

20. *See* Utah Code Ann. § 78–35a–102(1).

21. Under Utah's sentencing guidelines, Houskeeper's penalty in district court was more severe than it would have been in juvenile court. Specifically, because he was convicted of attempted rape in district court, Houskeeper was subject to prison time and served a year in jail. In the juvenile system, he would not have been subject to prison or jail time. *See* Utah Adult Sentencing and Release Guidelines Manual (2007); and Utah Juvenile Sentencing Guidelines Manual (2007). Additionally, juveniles are not "convicted" of crimes in juvenile court. Rather, they are "adjudicated delinquent." We use the term

"convicted" in this opinion only for convenience in comparing Houskeeper's treatment in district court to that of his treatment in juvenile court, had he been retained there.

22. Utah Code section 78A–6–1105(a)–(b) (Supp. 2008) provides for expungement of a juvenile's record for any offense except aggravated murder or murder.

23. Utah Code section 77–18–11(11)(b), (d)-(e) prohibits expungement of a conviction for a first degree felony, any sexual act against a minor, or any registerable sex offense.

24. 2006 UT App 294, 141 P.3d 601.

ing at this interpretation, the district court erred.[25]

¶ 31 The SYOA establishes a clear two-step bindover procedure that imposes a burden on both the State and the juvenile defendant. The first step requires the State to establish probable cause that the juvenile defendant committed a SYOA offense. If the State satisfies that burden, "the [juvenile] court shall order that the defendant be bound over and held to answer in the district court in the same manner as an adult."[26] The second step allows the juvenile to avoid this bindover and remain in juvenile court. To do so, the juvenile must establish by "clear and convincing evidence" all three of the following retention factors:

(i) the minor has not been previously adjudicated delinquent for an offense involving the use of a dangerous weapon which would be a felony if committed by an adult;

(ii) that if the offense was committed with one or more other persons, the minor appears to have a lesser degree of culpability than the codefendants; and

(iii) that the minor's role in the offense was not committed in a violent, aggressive, or premeditated manner.[27]

¶ 32 By its plain language, the SYOA clearly provides for two distinct steps in the bindover procedure. In interpreting *F.L.R.*, however, the district court collapsed these two steps, concluding, contrary to the plain language of the SYOA, that Houskeeper's bindover was automatic.

¶ 33 In arriving at its interpretation, the district court relied on a single sentence in *F.L.R.* in which the court of appeals noted that " '[t]here is nothing in the plain language of the [SYOA] requiring the juvenile court to find a level of violence [or] aggression ... greater than that inherent in the underlying offense.' "[28] This statement does not, however, imply that a juvenile can never satisfy the third retention factor. In fact, *F.L.R.* clarifies that "there may be instances where a juvenile *could prove* that his offense was not committed in a violent or aggressive manner."[29] Additionally, the court of appeals noted that "[i]t is foreseeable that a juvenile could commit an enumerated offense with a low level of violence and aggression, *so as to defeat the presumption* of district court jurisdiction over a serious youth offender."[30] The court of appeals has reiterated this position in a number of other cases.[31]

¶ 34 By the plain language of the SYOA and *F.L.R.*, there is a clearly delineated two-step procedure for determining when to bind over a juvenile to district court. Therefore, the district court erred in interpreting *F.L.R.* to mean that Houskeeper's bindover to district court was automatic once the State established probable cause that he committed a SYOA offense. It follows, then, that the district court also erred in denying Houskeeper's petition based on that interpretation. Whether Houskeeper's petition should be granted, however, depends on whether he established that he received ineffective assistance of counsel at the retention hearing. We next address that question.

## III. HOUSKEEPER ESTABLISHED THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL BY SATISFYING BOTH PRONGS OF *STRICKLAND*

¶ 35 At Houskeeper's June 2006 post-conviction hearing, the district court heard from

---

**25.** The State and Houskeeper agree that the district court misinterpreted *F.L.R.* Houskeeper notes that the trial court *"erroneously concluded* that [under *F.L.R.*] ... the finding of ineffective assistance of counsel was a futile gesture" (emphasis added). The State also concedes that the trial court *"erroneously concluded* that 'a finding that probable cause exists as to an aggravated offense results in automatic transfer to district court' " (emphasis added).

**26.** Utah Code Ann. § 78A–6–702(3)(b) (Supp. 2008).

**27.** *Id.*

**28.** 2006 UT App 294, ¶ 4, 141 P.3d 601 (alteration in original) (quoting *In re M.E.P.*, 2005 UT App 227, ¶ 11, 114 P.3d 596).

**29.** *Id.* at ¶ 3 (emphasis added).

**30.** *Id.* (emphasis added) (quoting *In re A.B.*, 936 P.2d 1091, 1101–02 (Utah Ct.App.1997)).

**31.** *See M.E.P.*, 2005 UT App 227, 114 P.3d 596; *State v. Lara*, 2003 UT App 318, 79 P.3d 951; *In re Z.R.S.*, 951 P.2d 1114 (Utah Ct.App.1998); *A.B.*, 936 P.2d at 1091.

witnesses who testified about Esplin's performance as counsel at the retention hearing and heard from Esplin himself. It reviewed the retention hearing transcript, the parties' written closing arguments, and the applicable case law. The district court then issued a memorandum decision, reciting the *Strickland*[32] standard for deciding ineffective assistance of counsel claims.

¶ 36 Under *Strickland,* a petitioner must prove that (1) "counsel's performance was deficient," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[33] The district court applied both prongs of *Strickland* to Esplin's performance at the retention hearing and concluded that it "was prepared to find that the *Strickland* factors for ineffective assistance of counsel had been met."

¶ 37 When "reviewing ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but review the application of the law to the facts for correctness."[34] Additionally, when reviewing a *Strickland* decision, this court has noted its "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[35] Therefore, to prevail on a claim, a petitioner has "the burden of meeting both parts of th[e] test."[36] Our review of the facts presented at Houskeeper's post-conviction hearing leads us to conclude that he met his burden and established that he received ineffective assistance of counsel at his retention hearing.

### A. The Performance of Houskeeper's Counsel Fell Below an Objective Standard of Reasonableness

¶ 38 To satisfy the first prong of *Strickland,* a petitioner must "identify the acts or omissions of counsel" which, under the circumstances, show that counsel's representation fell below an objective standard of reasonableness.[37] This court has found that counsel's performance falls below an objective standard of reasonableness when counsel does "not make a reasonable investigation into the availability of prospective witnesses."[38] In such cases, "counsel's performance cannot fall within the wide range of reasonable professional defense assistance."[39]

¶ 39 Houskeeper asserts that Esplin failed to investigate his case and provide any defense witnesses at the retention hearing—medical or character—to testify that his actions were not violent or aggressive in nature. In its findings of fact following Houskeeper's post-conviction petition hearing, the district court focused on the lack of defense witnesses presented by Esplin at the retention hearing. The court found that "Mr. Esplin did not provide any expert or character witness testimony on the issue of whether the act was completed in an aggressive and violent manner, to help the juvenile court make a decision whether the case should be retained in juvenile court." The district court contrasted that with the State's presentation of "at least four medical experts who testified as to the aggravated nature of the act." This contrast in quality and quantity of witnesses led the district court to conclude that Esplin "failed to fully understand the critical nature of the retention hearing and did not present an adequate defense at the bindover stage."

¶ 40 In support of its conclusion, the district court relied on witnesses who testified at the post-conviction hearing. Houskeeper called Ed Brass, an attorney who specializes in criminal law and has represented juveniles

32. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

33. *Id.* at 693–94, 104 S.Ct. 2052.

34. *Benvenuto v. State,* 2007 UT 53, ¶ 9, 165 P.3d 1195 (citations and internal quotation marks omitted).

35. *State v. Templin,* 805 P.2d 182, 186 (Utah 1990).

36. *Id.*

37. 466 U.S. at 690, 104 S.Ct. 2052.

38. *Templin,* 805 P.2d at 187.

39. *Id.* at 188 (internal quotation marks omitted).

at retention hearings, to testify. Brass testified that at Houskeeper's retention hearing, "Mr. Esplin could have presented the medical experts that were presented in the [jury] trial ... with respect to the issue of whether or not the crime ... was committed in an aggressive or violent or premeditated manner." Brass further pointed out that Houskeeper was convicted only of attempted rape, a crime devoid of any explicit element of aggression or violence.[40] Thus, Brass concluded, if the medical experts who testified on Houskeeper's behalf at the jury trial had also testified at his retention hearing, "certainly that would have bolstered the claim that this wasn't done in an aggressive, violent, [or] premeditated manner." Based on the evidence regarding Esplin's performance at the retention hearing, specifically his failure to present adequate defense witnesses, we find that the district court was correct in concluding that Houskeeper satisfied the first prong of *Strickland.*

### B. Houskeeper Suffered Prejudice as a Result of His Counsel's Deficient Performance

¶ 41 To satisfy the second prong of *Strickland,* petitioners must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[41] That is, petitioners must show they suffered some form of prejudice because of counsel's deficient performance.

¶ 42 In *Templin,* this court found that Templin suffered prejudice as a result of his counsel's failure to offer certain witness testimony on his behalf.[42] We found that this missing testimony likely "affect[ed] the 'entire evidentiary picture.'"[43] And while this court conceded that it could not "discern the exact effect such testimony would have had," we concluded that it was "of sufficient import that ... there is a reasonable probability that if these [additional] witnesses had been called at trial, the outcome ... would have been different."[44]

¶ 43 We recognize, as we did in *Templin,* that there is no way to discern the exact effect that any missing testimony would have had on the outcome of Houskeeper's retention hearing. In Houskeeper's case, however, we have the benefit of reviewing two proceedings—one with defense witnesses and one without. Without defense witnesses, Houskeeper was bound over to answer the charge of aggravated sexual assault, a crime that requires proof of aggression and/or violence.[45] With defense witnesses, Houskeeper was convicted of attempted rape, a crime that does not require proof of any explicit element of aggression and/or violence.[46]

¶ 44 The defense witnesses called at Houskeeper's criminal trial included medical experts who testified on his behalf. One of these experts was Susan Bryner Brown, a leading sexual assault examiner in Utah who is involved in "collecting data and doing research on pattern[s] of injury after consenting intercourse."[47] After reviewing the pho-

---

40. Utah Code Ann. 76–5–402 (Supp.2007) defines rape as the following: "[T]he actor has sexual intercourse with another person without the victim's consent." Similarly, section 76–4–101 defines "attempt" without any explicit element of violence or aggression.

41. 466 U.S. at 694, 104 S.Ct. 2052.

42. 805 P.2d at 188–89.

43. *Id.* at 188 (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052). Templin was charged with rape and convicted based chiefly on the testimony of the victim. At his criminal trial, his counsel failed to present a witness who had seen the defendant and victim kissing passionately for fifteen minutes consensually within an hour of the alleged rape. It was this missing testimony that this court found to be important.

44. *Id.*

45. Utah Code section 76–5–405(1) defines aggravated sexual assault to include "caus[ing] bodily injury to the victim," or "threatening the victim" during the course of a sexual assault.

46. *See supra* note 43.

47. In her voir dire examination, it was established that Susan Bryner Brown is a registered nurse who is credentialed to conduct sexual assault examinations. She has conducted and assisted in conducting over one thousand three hundred rape examinations. She is qualified to testify as a sexual assault expert in three Utah counties, helped develop the current Code–R rape examination kit for Utah, and assists in credentialing Utah nurses to perform Code–R examinations. She also has been trained by Dr.

tographs of Jessica's genital injuries, Ms. Brown testified that she could not "say with any absolute certainty" whether the injuries Jessica suffered resulted from consensual or nonconsensual contact. But she did testify that the type of trauma Jessica suffered was "consistent with" injuries incurred from first-time consensual sex, also known as "honeymoon laceration[s]." Ms. Brown further testified that it "wouldn't require a great amount of force" to inflict the type of injuries Jessica suffered. Dr. Michael Chandler, an anesthesiologist, also testified that the pain medication Jessica took on the night of the sexual encounter could create "intoxicat[ing] effects" and would "reduce the level of pain sensation" she felt.

¶ 45 Together, these experts' testimony specifically addressed the third retention factor regarding the level of violence and/or aggression that occurred during the sexual encounter between Houskeeper and Jessica. Because they based their testimony at the criminal trial on the same photographs and reports that were available at the retention hearing, they easily could have testified in that hearing as well.

¶ 46 Based on our review of the testimony that was offered on Houskeeper's behalf at the criminal trial, we find that the absence of that testimony at the retention hearing affected the entire evidentiary picture. We further conclude that there is a reasonable probability that if these witnesses had testified at the retention hearing, the outcome would have been different. That is, we find that Houskeeper suffered prejudice.

■ ¶ 47 The district court similarly found that "counsel's failure to present a full defense may have caused significant prejudice to Mr. Houskeeper ... [based on] the *severity of the consequences* " that resulted

from being tried as an adult.[48] The district court recognized that prejudice is not limited to the validity of the conviction at issue. Rather, prejudice can take the form of a more severe punishment. And that is the precise prejudice Houskeeper claims he suffered.

¶ 48 Houskeeper does not argue that the prejudice he suffered as a result of being tried as an adult is that he was convicted when he should have been acquitted. He acknowledges that he received a full, fair trial during which he was allowed to present every available defense. But the result of his attempted rape conviction was a harsher penalty than he would have received for the same or even greater conviction in juvenile court.[49] While the State asserts that Houskeeper suffered no prejudice because he received a "full and fair trial in district court," we find that the jury trial did not remedy the prejudice he suffered.

¶ 49 Houskeeper points to at least two forms of prejudice he suffered as a result of being tried as an adult. First, having been convicted of a felony that is also a registerable sex offense, he is unable to have his record expunged.[50] Had he been convicted in juvenile court of attempted rape or even the greater crimes of aggravated sexual assault and/or forcible sodomy, his conviction would have been subject to potential expungement.[51] Second, Houskeeper received far harsher penalties as a result of his conviction in district court than he would have been subject to in juvenile court. This is true whether he had been convicted in the juvenile court of attempted rape, aggravated sexual assault, forcible sodomy, or the combined crimes of aggravated sexual assault and forcible sodomy.[52]

¶ 50 Further, we find that he suffered the additional prejudice of being denied the reha-

Laura Slaughter, who has published four studies on patterns of injuries related to consensual and nonconsensual sexual contact.

48. (Emphasis added.)

49. *See supra* note 21.

50. Utah Code section 77–18–11(11)(b) prohibits expungement of a conviction for a first degree felony, any sexual act against a minor, or any registerable sex offense. Houskeeper also argues

that he suffered prejudice by being required to register as a sex offender. However, he would have been required to register had he been convicted of these crimes in juvenile court as well. Utah Code Ann. § 77–27–21.5(1)(b).

51. *Id.* § 77–18–11(1)(a).

52. *See supra* note 21.

bilitative services the juvenile court was established to provide. The legislature has stated that the purpose of the juvenile system is "rehabilitation, reeducation, and treatment." [53] Thus, the juvenile court should "strive to act in the best interests of the minor[ ]." [54] The juvenile sentencing guidelines reflect these goals with their "effort to rehabilitate ... young offenders" and "hopefully change juvenile behavior." [55] Houskeeper was denied these rehabilitative services.

¶ 51 In conclusion, we find that Housekeeper satisfied the *Strickland* test for establishing that he received ineffective assistance of counsel. Esplin's performance fell below an objective standard of reasonableness when he failed to present any defense witnesses at the retention hearing, and Houskeeper suffered prejudice through harsher penalties that resulted from being tried and convicted as an adult. Because he established that he received ineffective assistance of counsel, and he satisfies all other PCRA criteria, we order Houskeeper's post-conviction petition granted.

## IV. THIS COURT MAY FASHION AN APPROPRIATE REMEDY UNDER THE PCRA; THUS, WE REFORM HOUSKEEPER'S CONVICTION TO REFLECT A JUVENILE COURT DISPOSITION

¶ 52 Under the PCRA, when a court grants a post-conviction petition, it has broad discretion in fashioning remedies. The reviewing court may "vacate or modify the conviction or sentence." [56] And, if "the court vacates the original conviction or sentence, it shall enter ... *an appropriate order*." [57]

¶ 53 In this case, Houskeeper is not challenging the propriety of his conviction in district court. Because Houskeeper received a full, fair trial at that level, we do not vacate his conviction. Instead, we hereby order a remedy appropriate to Houskeeper's claim.

Houskeeper seeks a juvenile court disposition of his conviction for attempted rape. Because Houskeeper has served his jail sentence and paid his fine, the only relief a juvenile court disposition offers Houskeeper is the ability to petition to expunge his record. We therefore order Houskeeper's record expungeable in accordance with the requirements of Utah Code section 78A–6–1105.

## CONCLUSION

¶ 54 First, we hold that the PCRA applies to Houskeeper's claim that he received ineffective assistance of counsel at his juvenile court retention hearing. Second, we hold that the district court erred in interpreting *State v. F.L.R.* to stand for the proposition that Houskeeper's bindover to district court was automatic. The district court also erred in basing its denial of Houskeeper's petition on that interpretation. Third, we hold that Houskeeper established that he received ineffective assistance of counsel at his juvenile court retention hearing: Esplin's performance fell below an objective standard of reasonableness, and Houskeeper suffered prejudice by being tried and convicted as an adult rather than as a juvenile. Finally, we grant Houskeeper's petition and order that his record be made expungeable consistent with a juvenile disposition and in accordance with Utah Code section 78A–6–1105.

¶ 55 Chief Justice DURHAM, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice DURRANT's opinion.

WILKINS, Justice, dissenting:

¶ 56 I respectfully dissent.

¶ 57 In an effort to soften what they perceive as an unduly harsh consequence, my colleagues fail to acknowledge the unique and distinct role of the juvenile courts in our state court scheme. As they did in *State ex*

---

53. Utah Code Ann. § 78A–6–102(5)(c).

54. *Id.* § 78A–6–102(5)(g).

55. Utah Juvenile Sentencing Guidelines Manual (2007).

56. Utah Code Ann. § 78–35a–104(1) (2002).

57. Utah R. Civ. P. 65C(m)(1) (emphasis added).

*rel. K.M.*, they extend into the juvenile court presumptions and analytic tools used in the adult system that are not well suited for the different purposes and processes of the juvenile court. 2007 UT 93, 173 P.3d 1279. In doing so, they jeopardize the value of the juvenile court system as a whole and present obstacles to its function that will, in my view, eventually lead to its elimination or absorption by the adult process.

¶ 58 Spencer Houskeeper attempted to rape his fifteen-year-old female victim. In the process, she was injured by him enough to bleed, despite her resistance and her efforts to avoid being raped. This occurred in his automobile, at night, in an isolated location. He was convicted by a jury, and his conviction was affirmed on appeal. As a consequence, he is required under our law to register as a sex offender. None of these facts are at issue.

¶ 59 Having lost at trial and on appeal, he now asks us to relieve him of the obligation of registering as a sex offender for the same extended period imposed by law on all others found guilty of the same offense. My colleagues have found a way to do so.

¶ 60 Houskeeper was charged with aggravated sexual assault and forcible sodomy. The role of the juvenile court was to act first as a magistrate to determine if there was probable cause to believe that Houskeeper had committed aggravated sexual assault.[1] As my colleagues acknowledge, the State met this burden. The medical testimony, and that of the victim, was clearly enough to meet the probable cause standard required by law. At that point, the juvenile court was obligated to apply the "strong presumption" underlying the Serious Youth Offender Act[2] that the case be transferred to the district court.[3] Once transferred, the matter stays in the district court unless the defendant is acquitted on all charges, in which event any *new* matter involving the minor may be brought in the juvenile court.[4] Once transferred to the adult system, however, anything related to the charges for which the transfer is made stays in district court.[5]

¶ 61 Once probable cause has been established, the defendant may seek to overcome the "strong presumption" of transfer by proving all three of the retention factors.[6] Even if all three retention factors are clearly established, however, the policy embodied in the Serious Youth Offender Act that the matter is best dealt with in the adult system does not evaporate. The juvenile court is still faced with consideration of where the interests of justice, including the interests of the victim, of the defendant, and of society, will best be served, and retains jurisdiction only if convinced the quasi-criminal process of juvenile court, with its broad array of services, but limited array of criminal sanctions, is the best venue.

¶ 62 In the case of Houskeeper, the juvenile court had just been convinced that there was probable cause to believe that he had raped his fifteen-year-old victim in a violent or aggressive manner. No other conclusion would have supported bindover on the charge of aggravated sexual assault. And although Esplin, Houskeeper's attorney at the retention hearing, might well have presented expert medical testimony of possible other explanations for the injuries suffered by the victim, as was done at trial, to do so would have alerted the prosecution to those elements of defense well in advance of trial and, in my view, stood little chance of keeping the trial of an aggravated sexual assault in the juvenile court.

¶ 63 Only speculation supports the proposition that calling medical experts would have created any meaningful likelihood of a different result in the juvenile court. Moreover, I find it completely rational to see the "failure" to call defense witnesses at that stage as part of a reasonable defense strategy, one that

---

1. *See* Utah Code Ann. § 78A–6–702(3)(a) (Supp. 2008).

2. *Id.* §§ 78A–6–701 to –704.

3. *State v. F.L.R.*, 2006 UT App 294, ¶ 3, 141 P.3d 601 (quoting *In re A.B.*, 936 P.2d 1091, 1095, 1099 (Utah Ct.App.1997)).

4. *See* Utah Code Ann. § 78A–6–702(10)–(11).

5. *See id.* § 78A–6–702(7).

6. *See id.* § 78A–6–702(3)(b)–(d).

ultimately got Houskeeper acquitted of the aggravated sexual assault charge. I also find no support for the conclusion that the consequences to Houskeeper in juvenile court would automatically have been more favorable.

¶ 64 Had he been tried on the charges of aggravated sexual assault and of forcible sodomy in the juvenile court, he would have been tried without a jury.[7] Upon conviction of attempted rape, had that been the result, he could have been sentenced to secure confinement until his twenty-first birthday, in addition to all of the probationary and monetary consequences available to the court.[8] The only certainty of a better result, had he stayed in the juvenile system, would have been a reduction in the requirement that he register as a sex offender from life to ten years.[9]

¶ 65 I would not extend the reach of the Post–Conviction Remedies Act[10] ("PCRA") to include review of juvenile court proceedings when challenging action in the district court. I do not see the extension as either mandated or wise. Many activities in the juvenile court system have an impact on charging and sentencing in the adult system. Arguably, any of those steps would be subject to PCRA review under the analysis used by my colleagues here.

¶ 66 I also find no justification for the presumption that the juvenile court would have retained jurisdiction of Houskeeper's case had additional witnesses been called at the retention hearing. None were fact witnesses to the assault. None could testify directly of the degree of aggravation, or lack thereof, in the sexual assault. Testimony of Houskeeper's character would not have changed that either. Faced with the facts before it, even assuming presentation of the experts suggested by my colleagues, the juvenile court may well have still transferred the case to the adult system. No showing to the contrary has been made, or even offered by Houskeeper.

¶ 67 Moreover, even ignoring the *Strickland* presumption that defense counsel had a reason for his "failure" to call witnesses, only the sex offender registry requirement is likely to have been "more favorable" in outcome. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). All other consequences could have been more severe than those actually meted out by the district court, and the defendant has given us no reason to believe that they would have been more favorable. In fact, given the less severe maximum available to the juvenile court, the likelihood of Houskeeper having been convicted as charged remains unchallenged. As a result, even under the nonbinding sentencing guidelines applicable to juvenile proceedings at the time, he may well have faced more time incarcerated and harsher penalties, other than the length of his obligation to register as a sex offender.

¶ 68 Given the independent nature of the juvenile process and the different objectives of juvenile court action, I would hold that a post-conviction relief petition filed following a trial in the district court can reach back no further than the time of acquisition of district court jurisdiction. As we have previously held in this matter, the proper time to object to the juvenile court's application of the provisions of the Serious Youth Offender Act is at the time of the transfer order, and not at any other time. *State v. Houskeeper,* 2002 UT 118, ¶ 23, 62 P.3d 444.

¶ 69 I would also hold that applying the *Strickland* standards to representation in juvenile court must include not only a review of counsel's actions considered in a juvenile court context, as opposed to the adult system, but also that the consequences of any action or failure by counsel in the juvenile proceeding must be measured against the likelihood of a more favorable outcome in the juvenile proceeding, not a more favorable overall outcome contrasted to the adult result.

¶ 70 Finally, I see no need to craft a remedy to further intermingle the adult and

7. *See* Utah Code Ann. § 78A–6–114(1).

8. *See id.* § 78A–6–117(2).

9. *See id.* § 77–27–21.5(10)(a), (c)(ii)(B)(III).

10. *Id.* §§ 78B–9–101 to –405.

juvenile processes. Consequently, I dissent and would affirm the result reached by the trial court.