186 Cal.App.4th 1411 (2010)
112 Cal. Rptr. 3d 892
In re SKYLER H., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY et al., Plaintiffs and Respondents,
v.
JENNIFER H., Defendant and Appellant.
No. D056307.
Court of Appeals of California, Fourth District, Division One.
July 28, 2010.
*1417 Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, and Katharine R. Bird, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services Agency.
Patricia K. Saucier, under appointment by the Court of Appeal, for Respondent Kenneth I.
Valerie N. Lankford, under appointment by the Court of Appeal, for Minor.

OPINION
BENKE, Acting P. J.
Jennifer H. appeals orders terminating parental rights under Welfare and Institutions Code section 366.26.[1] She also appeals an order summarily denying her petition for modification under section 388. Jennifer asserts the court did not comply with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA or federal act). We affirm.

INTRODUCTION
While the standard for ICWA notice is low, it is not without reasonable limits. This case raises the issue whether a child's specific but attenuated Indian heritage invokes ICWA notice requirements under section 224.3, subdivision (b), which describes circumstances that may provide reason to *1418 know the child is an Indian child. We hold the trial court has discretion to consider the totality of the information presented concerning the child's family circumstances to determine whether it meets the threshold required for ICWA notice"the court . . . knows or has reason to know [the child is] an Indian child. . . ." (§ 224.2, subd. (a).) We further hold ICWA notice is not required unless the totality of the family's circumstances indicate there is a low but reasonable probability the child is an Indian child. Here, we conclude the case need not be remanded for ICWA notice because the family's specific but attenuated Indian heritage does not provide reason to know the child is an Indian child.
We further conclude that the trial court did not abuse its discretion when it found that the parent did not show a prima facie case of changed circumstances and best interests of the child, and summarily denied her petition for modification under section 388. In addition, we conclude there is substantial evidence to support the court's finding the beneficial parent-child relationship exception did not apply.

FACTUAL AND PROCEDURAL BACKGROUND
Skyler H., now age 11, is the daughter of Jennifer H. and Kenneth I. (together, the parents). When Skyler was a baby, Kenneth placed her in the care of her paternal grandmother (Grandmother) because Jennifer was "running the streets with [Skyler]." In April 2003, when Skyler was three years old, the San Diego County Health and Human Services Agency (the Agency) filed a petition alleging a paternal uncle hit Skyler and she was exposed to violent confrontations between the paternal uncle and her older half sister, Amber. (§ 300, subd. (b).) Amber said Jennifer "hardly ever" visited Skyler, perhaps once every two months.
Kenneth had a criminal history dating from 1989, primarily for drug violations. He was incarcerated when the proceedings began.
The Agency located Jennifer in local custody. She was convicted in 2002 for threatening to commit a crime resulting in death or great bodily injury. In 1996 Jennifer was convicted of receiving stolen property.
The court recognized Grandmother as Skyler's de facto parent and placed Skyler in her home.
In August 2003 the court ordered a plan of reunification services for Jennifer. Within a short time, Jennifer was noncompliant with her substance abuse treatment program. By December she had not participated in services, visited Skyler or contacted the social worker in more than two months.
*1419 In February 2004 Jennifer was remanded to the custody of California's former Department of Corrections (CDC) for two years for violating the terms of her probation.
Grandmother did not believe either parent would stay out of jail long enough to provide a home for Skyler. In July 2004, at the 12-month status review hearing, the court identified a permanent plan of legal guardianship for Skyler with Grandmother. In January 2005 the court appointed Grandmother guardian and terminated jurisdiction.
In October 2008 the Agency filed a petition alleging Grandmother had left Skyler with Kenneth and allowed her to reside in filthy conditions. Skyler was begging the neighbors for food and money, and she was dirty and unkempt. Kenneth was using methamphetamine. He assaulted his girlfriend and held a shotgun to her head in front of Skyler and his baby daughter. After Skyler was detained, she was diagnosed with a kidney infection.
Jennifer was in local custody. She had been arrested in April 2008 and was convicted on charges of possession of narcotics, reckless driving and possession of a hypodermic needle/syringe. She admitted she had used methamphetamine since she was 16 years old. Jennifer last saw Skyler in January 2008, when she had Skyler in her care for a week. Jennifer told the social worker she wanted to stop using drugs and have Skyler back in her life. In September Jennifer entered the pregnant and parenting inmates program, which provided substance abuse treatment and health education for pregnant, postpartum or parenting women.
Kenneth was arrested in October 2008 for smuggling Mexican nationals into the United States. He was incarcerated until February 2009.
At a special hearing, the social worker reported that the maternal grandmother, Mrs. H., stated her great-grandfather was a "full-blooded" Cherokee who had lived in Arkansas. Mrs. H. did not know the specific tribe. She believed he had "signed the family's rights away to get any benefits from the tribe." Each year, Mrs. H. attended an intertribal pow-wow on Father's Day, and participated in one of the dances. However, neither she nor any other family member was enrolled in any tribe, had lived on an Indian reservation or in an Indian community, or had received any services or benefits available to Indians. The court found that Skyler was not an Indian child within the meaning of ICWA.
In December 2008 the court terminated Grandmother's guardianship and selected a permanent plan of long-term foster care for Skyler. The court granted the parents reasonable supervised visitation. Skyler's baby half sister was also placed with the same family.
*1420 In May 2009, at the Agency's request, the court referred the matter for a section 366.26 hearing. Skyler's foster parents were interested in adopting her.
Several days before the scheduled 366.26 hearing, Jennifer filed a section 388 petition asking the court to place Skyler with her or, alternatively, allow her to have an opportunity to reunify with Skyler. Jennifer averred she had completed a drug treatment program, an anger management program and two parenting classes. She was discharged from parole in June 2009, and had remained drug free. Jennifer shared a residence with a female roommate. She consistently visited Skyler, who seemed happy to see her.
The section 366.26 hearing was held on November 16, 2009. The court summarily denied Jennifer's section 388 petition.
The social worker reported that Skyler, who was almost 10 years old, was "a joy of a child." She was resilient, high-spirited, engaging, polite and sweet. Skyler was focused on school and her friends, and did not act out. The social worker testified she had talked to Skyler about adoption. Skyler did not want to live under guardianship because it had not worked for her in the past. She was a very bright child and understood her parents would not have any legal rights to her. Skyler had a good understanding of adoption and wanted to be adopted by her foster care parents. She was happy where she was living. The social worker believed she loved her foster parents and family.
Skyler visited Jennifer and Kenneth separately. She was affectionate with each parent. Jennifer praised and complimented Skyler, and treated her lovingly. At one visit, Skyler asked Jennifer to pick her up and carry her for a few minutes, which Jennifer did. At times Skyler was animated and stayed close to Jennifer. At other visits, she was reserved and less responsive. Skyler was cheerful after visiting Kenneth. Skyler liked visiting her parents. She said she would be sad but it would be "ok" if she could not visit them. The social worker believed it "would be good" if Skyler could occasionally visit Jennifer.
The court found that there was strong evidence there would be no barriers to Skyler's adoption by her foster care parents. The court said Skyler knew her parents and loved them, as did most abused children. However, Skyler longed for stability, and adoption would meet her needs. The court terminated Jennifer's and Kenneth's parental rights.

DISCUSSION
Jennifer raises three claims of error on appeal. She contends the trial court erred when it concluded Skyler was not an Indian child and the matter should *1421 be remanded to the trial court with directions to comply with ICWA notice requirements. Jennifer argues she established a prima facie case of changed circumstances and best interests to merit a hearing on her section 388 petition, and requests this court reverse the order terminating parental rights and remand for a hearing under section 388. Jennifer also asserts reversal of the order terminating parental rights is required because the court's finding the beneficial parent-child relationship exception did not apply is not supported by substantial evidence.
Kenneth did not file a notice of appeal, but joins with Jennifer's brief. He contends if this court reverses the order terminating Jennifer's parental rights, his parental rights must also be reinstated.

I

ICWA
(1) Skyler's great-great-great-grandfather was "full-blooded Cherokee" and her maternal grandmother, Mrs. H., participated in an annual Indian pow-wow. Jennifer argues these facts give the court reason to know the child is an Indian child, requiring notice under sections 224.2 and 224.3, subdivision (d). We do not agree. We conclude the family's circumstances do not provide sufficient reason to know Skyler is a member of, or is eligible for membership in, an Indian tribe, as defined in 25 United States Code section 1903(4) and applicable case law. The trial court did not err when it found that ICWA did not apply.
In this part, we discuss the goals of ICWA and its implementation in section 224 et seq. (state ICWA act or state act). We examine section 224.3, subdivision (b), which is the threshold statute for ICWA notice under state law, and compare its terms to the recommendations found in section B.1, "Determination That Child Is an Indian," of the Bureau of Indian Affairs (BIA) Guidelines for State Courts,[2] clarifying this court's decision in In re Damian C. (2009) 178 Cal.App.4th 192, 196 [100 Cal.Rptr.3d 110] (Damian C.). We discuss the definition of an "Indian child" and the meaning of "reason to know." After reviewing prior case law addressing ICWA notice requirements, we evaluate the facts of this case in view of our conclusion that while the standard for ICWA notice is low, notice is not required unless there is a reasonable probability the child is an Indian child. Finally, within the *1422 context of the dependency system, we consider the needs of a dependent child, whether Indian or non-Indian, for a safe, permanent home. We are mindful of the appropriate use of judicial resources, including the resources of the social service agency in its capacity as an arm of the court.
Issues of law are reviewed de novo. (Imperial Merchant Services, Inc. v. Hunt (2009) 47 Cal.4th 381, 387 [97 Cal.Rptr.3d 464, 212 P.3d 736] (Hunt).)
(2) The United States Congress enacted ICWA to respond to a crisis occurring in Indian tribes in which large numbers of Indian children were removed from their families for placement in non-Indian homes. (Mississippi Choctaw Indian Band v. Holyfield (1989) 490 U.S. 30, 32 [104 L.Ed.2d 29, 109 S.Ct. 1597] (Holyfield).) ICWA was intended to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of Indian children in foster or adoptive homes reflecting the values of Indian culture. (25 U.S.C. § 1902; In re Jeremiah G. (2009) 172 Cal.App.4th 1514, 1520 [92 Cal.Rptr.3d 203]; In re Kahlen W. (1991) 233 Cal.App.3d 1414, 1421 [285 Cal.Rptr. 507] (Kahlen W.).) ICWA applies when the state knows or has reason to know an Indian child is involved, and seeks to place the child in foster care or terminate parental rights in an involuntary proceeding. (25 U.S.C. § 1912(a).)
(3) Effective January 1, 2007, the California Legislature codified ICWA notice requirements in a comprehensive reorganization of statutes related to the application of ICWA in section 224 et seq. (Damian C., supra, 178 Cal.App.4th at p. 196.) Adopting language from 25 United States Code section 1912(a), the state ICWA notice provisions direct the court[3] to provide notice to the parent or Indian custodian, and the tribe, of an Indian child, if the court "knows or has reason to know that an Indian child is involved" in the proceedings. (§§ 224.2, subd. (a), 224.3, subd. (d); see In re Shane G. (2008) 166 Cal.App.4th 1532, 1538 [83 Cal.Rptr.3d 513] (Shane G.).) Notice requirements are intended to ensure the child's Indian tribe will have the opportunity to intervene and assert its rights in the proceedings. (Kahlen W., supra, 233 Cal.App.3d at p. 1421.)
The decision whether a child is a member of, or eligible for membership in, the tribe is the sole province of the tribe. (§ 224.3, subd. (c).) However, as we will discuss, before the tribe makes that decision, the trial court must determine whether it has "reason to know" the child is an Indian child, requiring notice to the tribe. Under section 224.3, subdivision (b), that determination is committed to the sound discretion of the trial court.
*1423 This court has stated the Legislature, in enacting the state ICWA act, intended the state notice provisions to be more expansive than ICWA and to standardize the interpretation of ICWA provisions and inquiry and noticing practice throughout the state. (Damian C., supra, 178 Cal.App.4th at p. 197.) However, Damian C. did not discuss the variance in the notice requirements between the state ICWA act and the BIA Guidelines. (§ 224.3, subd. (b); Guidelines, supra, § B.1(c), at p. 67585.)
(4) State law must be liberally construed in favor of Indian interests. (Holyfield, supra, 490 U.S. at p. 51, fn. 26.) In determining legislative intent, we first look to the best indicator of legislative intentthe statutory language itself. (Mejia v. Reed (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166]; Adoption of Kelsey S. (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) The words must be construed with reference to the entire system of law of which it is a part. (Moore v. Panish (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].) Thus, section 224.3, subdivision (b), is viewed in the context of ICWA, the state act and the dependency system. Keeping in mind the primacy of Indian interests in ICWA notice, we ascertain the Legislature's intent by looking to the words of the statute and giving them" `their usual and ordinary meaning.'" (Hunt, supra, 47 Cal.4th at p. 387, quoting DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].) "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (Coalition of Concerned Communities, Inc. v. City of Los Angeles (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)
(5) While the state's notice provisions are broader than the applicable federal statute (Damian C., supra, 178 Cal.App.4th at p. 197), the statutory language in section 224.3, subdivision (b), which establishes the threshold requirements for notice, is not as expansive as the BIA's recommendations of the criteria to determine whether the child is an Indian child. (25 U.S.C. § 1912(a); Guidelines, supra, § B.1, at p. 67585.) The plain language of section 224.3, subdivision (b), permits the conclusion the Legislature intended the threshold for state ICWA notice to be more restrictive than the threshold recommended by the Guidelines. (§§ 224.2, 224.3, subds. (b), (d).)
The differences between the statutory language in state ICWA notice requirements and section B.1 of the Guidelines are instructive. First, the Guidelines recommend the state court provide ICWA notice when it has "reason to believe the child is an Indian child."[4] (Guidelines, supra, § B.1, at *1424 p. 67586.) As we have discussed, the Legislature has adopted the more restrictive "reason to know" language from the federal statute. (§§ 224.2, 224.3, subd. (d); 25 U.S.C. § 1912(a).) Second, the Guidelines list a number of circumstances "under which a state court has reason to believe a child involved in an involuntary child custody proceeding is an Indian child ...."[5] (Guidelines, § B.1(c), at p. 67586.) If one or more of these circumstances exist, the Guidelines state the court "shall seek verification of the child's status from either the [BIA] or the child's tribe." (Id., § B.1(a), at p. 67586.) Thus, if a state follows the Guidelines, it must take further action if one or more of the family's circumstances are described in section B.1(c) of the Guidelines.
(6) The Legislature, in enacting section 224.3, subdivision (b), did not adopt the mandatory language recommended by the Guidelines. We presume the Legislature was aware of the Guidelines when it enacted the state act. (Cf. People v. Roberts, supra, 184 Cal.App.4th at p. 1180; People v. Strohl, supra, 57 Cal.App.3d at pp. 359-360.) Rather, section 224.3, subdivision (b), describes circumstances that may provide reason to know the child is an *1425 Indian child. (§ 224.3, subd. (b)(1)-(3); see also rule 5.481(a)(5).) These circumstances include, but are not limited to, the following:
"(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe.
"(2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community.
"(3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service." (§ 224.3, subd. (b)(1)-(3).)
The word "may" indicates possibility or probability (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 767) and indicates the court has discretion to evaluate the information concerning the family's circumstances under section 224.3, subdivision (b). If after inquiry[6] the court or social worker "knows or has reason to know" an Indian child is involved, notice must be sent to the child's parents, Indian custodian, if any, and the child's tribe. (§§ 224.2, 224.3, subds. (b), (d).) However, the inclusion of the word "may" indicates that even if the family's circumstances are described to some extent in section 224.3, subdivision (b), the court is not required to provide notice under the state act if those circumstances do not provide "reason to know" the child is an "Indian child."
(7) The meaning of the terms "Indian child" and "reason to know" are central to the court's obligation to provide notice. In construing the extent of the court's obligation under state law, we look to the words of the statutes to determine legislative intent and to fulfill the purpose of the law. (Gooch v. Hendrix (1993) 5 Cal.4th 266, 282 [19 Cal.Rptr.2d 712, 851 P.2d 1321]; In re Heraclio A. (1996) 42 Cal.App.4th 569, 574 [49 Cal.Rptr.2d 713].) We give significance to every word, phrase, sentence and part of an act in pursuing the legislative purpose. (People v. Canty (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)
(8) Federal law defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is *1426 eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."[7] (25 U.S.C. § 1903(4).) Membership requirements vary from tribe to tribe; enrollment is not always required. (U.S. v. Broncheau (9th Cir. 1979) 597 F.2d 1260, 1263; see In re Arianna R.G. (2003) 2003 WI 11 [259 Wis.2d 563, 575, 657 N.W.2d 363].) Section 224.1, subdivision (a), provides the terms used in the state act, including "Indian child," are defined as specified in ICWA, unless the context in which the term is used requires another definition. (§ 224.2, subd. (a).) We can find no reason to depart from the definition of "Indian child" in 25 United States Code section 1903(4), as clarified by applicable case law. (See, e.g., U.S. v. Broncheau, supra, at p. 1263; In re B.R., supra, 176 Cal.App.4th at pp. 784-785; In re Antoinette S., supra, 104 Cal.App.4th at p. 1408; In re Arianna R.G., supra, at p. 575, fns. 12 & 13.)
ICWA and the applicable federal regulations do not define "reason to know." (In re S.B., supra, 130 Cal.App.4th at p. 1158.) This permits the reasonable inference the phrase is to be interpreted according to its ordinary meaning. "Reason to know" is broadly defined as "[i]nformation from which a person of ordinary intelligence ... would infer that the fact in question exists or that there is a substantial enough chance of its existence that, if the person exercises reasonable care, the person can assume the fact exists." (Black's Law Dict. (8th ed. 2004) p. 1294.)[8] Under section 224.3, subdivision (b), the fact at issue is the child's status as an Indian child. In this context, "chance" is defined as "the degree of likelihood of such an outcome." (Merriam-Webster's Collegiate Dict., supra, at p. 205.) Construing "reason to know" in favor of Indian interests, we hold the family's circumstances should indicate there is a "substantial enough chance," or low but reasonable probability, the child is a member of, or eligible for membership in, an Indian tribe. (25 U.S.C. § 1903(2); § 224.2, subd. (a).)
(9) Reviewing courts, including this court, have recognized there must be sufficient indication the child is an Indian child within the meaning of ICWA to invoke notice requirements. (In re Jeremiah G., supra, 172 Cal.App.4th at p. 1520; Shane G., supra, 166 Cal.App.4th at p. 1538; In re O.K. (2003) 106 *1427 Cal.App.4th 152, 157 [130 Cal.Rptr.2d 276]; see In re Christopher I. (2003) 106 Cal.App.4th 533, 567 [131 Cal.Rptr.2d 122].) Thus, a mere hint or suggestion of Indian ancestry is no longer sufficient to require notice under state law. (Contra, In re Robert A. (2007) 147 Cal.App.4th 982, 989 [55 Cal.Rptr.3d 74]; In re Nikki R., supra, 106 Cal.App.4th at p. 848; In re Antoinette S., supra, 104 Cal.App.4th at p. 1408; Dwayne P. v. Superior Court (2002) 103 Cal.App.4th 247, 258 [126 Cal.Rptr.2d 639].) "[B]oth the federal regulations and the California Welfare & Institutions Code require more than a bare suggestion that a child might be an Indian child." (In re Jeremiah G., supra, at p. 1520.)
The opinions of the Supreme Courts of Wisconsin and Colorado concerning this issue are relevant here. The Wisconsin Supreme Court stated the term "Indian child" as defined by ICWA means "something more specific than merely having Native American ancestors." (In re Arianna R.G., supra, 259 Wis.2d at p. 574.) The Colorado Supreme Court adopted a totality of the circumstances test to determine whether ICWA notice is required. It stated "[p]recisely what constitutes `reason to know' or `reason to believe' in any particular set of circumstances will necessarily evade meaningful description. As in other contexts, reasonable grounds to believe must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge." (B.H. v. People ex rel. X.H. (Colo. 2006) 138 P.3d 299, 303.)
The Indian status of the child does not have to be certain to invoke the notice requirement. (Dwayne P. v. Superior Court, supra, 103 Cal.App.4th 247; In re O.K., supra, 106 Cal.App.4th 152.) However, while the threshold of providing notice under state law is low, it is not without reasonable limits. (Cf. In the Interest of Z.H. (Iowa Ct.App. 2007) 740 N.W.2d 648, 653.) In view of the totality of the family's circumstances, a child's specific but attenuated Indian heritage may not be sufficient to provide reason to know an Indian child is involved. Where the totality of the family's circumstances does not indicate there is a low but reasonable probability the child is an Indian child, the court does not have reason to know an Indian child is involved, and notice is not required. (Cf. B.H. v. People ex rel. X.H., supra, 138 P.3d at p. 303.) This is the case here.
Mrs. H. provided specific and credible information about the family's Indian heritage and her own continued participation in an annual intertribal cultural event. While the information Mrs. H. provided about Skyler's great-great-great-grandfather could be broadly construed to suggest Skyler's great-grandparent was a member of a Cherokee tribe, an overbroad construction does not serve ICWA's goal to promote the security and stability of *1428 Indian tribes (25 U.S.C. § 1902) or the child's interest in a prompt resolution of his or her custody status (In re A.M. (2008) 164 Cal.App.4th 914, 925 [79 Cal.Rptr.3d 620]). Skyler is five generations removed from the last family member known to be a member of an Indian tribe. Jennifer stated she had Indian heritage but it was "too little to know." Mrs. H. did not claim she or one of her parents was a tribal member. Under the totality of these circumstances, it is not reasonably probable Skyler is an Indian child. Thus, the court did not have reason to know Skyler is a member of, or eligible for membership in, an Indian tribe, and notice is not required.
(10) ICWA and the state act do not contravene the goals of California's dependency scheme, which is to reunify the family when safe for the child, and to provide the child with a safe, permanent, stable home within the time limits defined by the Legislature. (§§ 300.2, 361.5, subd. (a); see §§ 366.21, 366.22, 366.26.) If the dependent child is an Indian child, this home must "reflect[] the unique values of the child's tribal culture and is best able to assist the child in establishing, developing, and maintaining a political, cultural, and social relationship with the child's tribe and tribal community." (§ 224, subd. (a)(1); see §§ 361.31, 361.7.) Where the child's family has not had a relationship with an Indian tribe for many generations, as here, notice becomes a formality that does not serve ICWA's goals or the child's best interests. We do not believe the Legislature intended the courts to engage in "empty formalities" that result in waste of scarce judicial resources. (In re G.L. (2009) 177 Cal.App.4th 683, 696 [99 Cal.Rptr.3d 356], citing In re E.W. (2009) 170 Cal.App.4th 396, 402 [88 Cal.Rptr.3d 338]; In re Z.N., supra, 181 Cal.App.4th at pp. 300-301.)
Interpreting section 224.3, subdivision (b), to require notice where the family's Indian heritage is specific but attenuated would delay permanency for a child such as Skyler, who was first made a dependent of the juvenile court in 2003, and is only now finding a safe, stable and permanent home. We conclude the circumstances presented here do not provide the court reason to know Skyler is an Indian child, and reversal for ICWA notice is not required. (Shane G., supra, 166 Cal.App.4th at p. 1539.)

II

SECTION 388
Jennifer contends the trial court erred when it arbitrarily denied an evidentiary hearing on the merits of her section 388 petition. She argues the petition stated a prima facie case of changed circumstances and the child's best interests, and thus the court was required by law to hold a hearing. Jennifer also argues the court considered the evidence presented in the *1429 Agency's court reports without affording her an opportunity to be heard and to controvert the evidence against her.
(11) Under section 388, a party may petition the court to change, modify or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed modification is in the child's best interests. (§ 388; In re Jasmon O. (1994) 8 Cal.4th 398 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297]; In re Amber M. (2002) 103 Cal.App.4th 681, 685 [127 Cal.Rptr.2d 19].)
The court must liberally construe the petition in favor of its sufficiency. (In re Marilyn H. (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826] (Marilyn H.); rule 5.570(a).) "The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (Marilyn H., at p. 310; see In re Hashem H. (1996) 45 Cal.App.4th 1791, 1798-1799 [53 Cal.Rptr.2d 294].) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (In re Zachary G. (1999) 77 Cal.App.4th 799, 806 [92 Cal.Rptr.2d 20] (Zachary G.).) When "determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (In re Justice P. (2004) 123 Cal.App.4th 181, 189 [19 Cal.Rptr.3d 801]; see In re Jamika W. (1997) 54 Cal.App.4th 1446, 1450-1451 [63 Cal.Rptr.2d 513].)
We review a summary denial of a hearing on a modification petition for abuse of discretion. (Zachary G., supra, 77 Cal.App.4th at p. 808.)
(12) Jennifer misconstrues the record when she argues the court violated her due process rights to be heard when it accepted the evidence offered by the Agency. The court is required to read and consider the Agency's reports when it selects a permanency plan for a child. (§ 366.26, subd. (b).) Jennifer filed her section 388 petition only two days before the scheduled section 366.26 hearing, and the court did not address Jennifer's petition until the opening of the hearing. The court's remarks clearly show it relied on the uncontroverted history of the case, not on any new evidence, when it determined whether Jennifer's petition stated a prima facie case. The trial court may consider the entire factual and procedural history of the dependency proceedings when it determines whether to grant a hearing on the merits of a section 388 petition. (In re Jasmon O., supra, 8 Cal.4th at p. 415.) Here, the court considered Jennifer's failure to reunify with Skyler in the 2003 case, Jennifer's criminal history and drug use, and the fact Skyler had not lived with Jennifer for many years. These facts were not subject to challenge. We conclude that Jennifer's due process rights to be heard and to challenge the evidence against her were not violated.
*1430 The trial court's summary denial of the section 388 petition is fully supported by the record. (Zachary G., supra, 77 Cal.App.4th at p. 808.) Jennifer averred she had maintained her sobriety for six months after having used methamphetamine for almost 20 years. The court drew the reasonable inference Jennifer's short period of sobriety relative to her lengthy substance abuse history did not establish a prima facie case of changed circumstances. Further, Jennifer did not show it was in Skyler's best interests to postpone a permanency decision in the hope she might reunify with Jennifer. Jennifer effectively abandoned Skyler when she was a baby, and went for long periods of time without visiting her or being involved in her life. She did not participate in reunification services in the 2003 case, and had been periodically incarcerated since 2003. In view of these circumstances, the court did not err when it summarily denied Jennifer's section 388 petition.

III

THE BENEFICIAL PARENT-CHILD RELATIONSHIP EXCEPTION
Jennifer contends the trial court erred when it terminated her parental rights. She argues termination of parental rights would be detrimental to Skyler because they shared a beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).)
(13) At a section 366.26 hearing, the trial court may select one of three alternative permanency plans: adoption, guardianship, or long-term foster care. (In re Taya C. (1991) 2 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 810].) Unless the child is living with a relative who is unwilling or unable to adopt the child, there is a strong preference for adoption over alternative plans. (§ 366.26, subd. (c)(1)(A); San Diego County Dept. of Social Services v. Superior Court (1996) 13 Cal.4th 882, 888 [55 Cal.Rptr.2d 396, 919 P.2d 1329]; Zachary G., supra, 77 Cal.App.4th at pp. 808-809.) If the court determines the child is likely to be adopted, the burden shifts to the parent to show termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).
An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[B]enefit from continuing the relationship" means "the [parent-child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (In re Autumn H. (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535] (Autumn H.).) The exception does not require proof the child has a *1431 "primary attachment" to a parent or the parent has maintained day-to-day contact with the child. (In re S.B. (2008) 164 Cal.App.4th 289, 299 [79 Cal.Rptr.3d 449]; In re Brandon C. (1999) 71 Cal.App.4th 1530, 1534-1538 [84 Cal.Rptr.2d 505]; In re Casey D. (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426].)
If the parent has continued to regularly visit and contact the child, and the child has maintained or developed a significant, positive, emotional attachment to the parent, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (Autumn H., supra, 27 Cal.App.4th at p. 575.)
We determine whether there is substantial evidence to support the court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (Autumn H., supra, 27 Cal.App.4th at p. 576; In re S.B., supra, 164 Cal.App.4th at p. 298.)
Jennifer points to several of her more positive interactions with Skyler during her supervised visitation and asks us to reweigh the evidence. The record shows Skyler enjoyed visiting Jennifer. However, for the same reasons we have previously discussed, ante, at page 1430, we conclude there is ample evidence to support the court's ruling. When Skyler was a baby, Jennifer was "running the streets" with her. Jennifer did not consistently visit Skyler when she was in Grandmother's care. Jennifer did not attempt to reunify with Skyler in the 2003 dependency proceedings. She was periodically incarcerated during Skyler's guardianship. When the 2008 proceedings began, Kenneth stated Jennifer had not been involved with Skyler for three years. Skyler was living in squalid, filthy conditions and was begging the neighbors for food. Jennifer did not start visiting Skyler regularly until late 2008, when Skyler was nine years old. The record clearly establishes Jennifer's lack of visitation and contact with Skyler, and the beneficial parent-child relationship exception fails on that prong alone.
Further, because of Jennifer's lack of consistent contact with Skyler, the trial court could reasonably conclude Skyler did not view Jennifer as a parental figure. The social worker, in her capacity as an expert witness, stated Skyler did not have a beneficial parent-child relationship with either her mother or father. When the social worker spoke to Skyler about the possibility she might not be able to visit Jennifer if she were adopted, Skyler said, *1432 "Yeah, that's fine." The social worker opined Skyler had some emotional bonds with her birth family, but those bonds did not outweigh the benefits of stability and permanency that adoption would provide. (Autumn H., supra, 27 Cal.App.4th at p. 575.)
Jennifer did not meet either prong of the beneficial parent-child relationship exception to termination of parental rights. Further, 11-year-old Skyler clearly understood the concept of adoption and wanted to be adopted by her foster family. Skyler's understanding and preference clearly support the finding she would not be greatly harmed by termination of parental rights. (§ 366.26, subd. (c)(1); Autumn H., supra, 27 Cal.App.4th at p. 575.) The court's finding the exception did not apply is fully supported by the record.

DISPOSITION
The findings and orders are affirmed.
Huffman, J., and Aaron, J., concurred.
NOTES
[1] Further statutory references are to the Welfare and Institutions Code.
[2] See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584 (Nov. 26, 1979) (Guidelines). The Guidelines expressly provide they "are not intended to have binding legislative effect" on state courts. (Ibid.; In re S.B. (2005) 130 Cal.App.4th 1148, 1157 [30 Cal.Rptr.3d 726].)
[3] State law also imposes the obligation on the social worker and probation officer to provide notice. (§§ 224.2, subd. (a), 224.3, subds. (a), (d).)
[4] Prior to the 2007 state act, the First Appellate District, citing the Guidelines, adopted "reason to believe the child is an Indian child" as the threshold to determine whether ICWA notice was required. (Guidelines, supra, § B.1, at pp. 67584, 67586; In re Junious M. (1983) 144 Cal.App.3d 786, 788 [193 Cal.Rptr. 40].) This language has been followed by other appellate courts. (See, e.g., In re Desiree F. (2000) 83 Cal.App.4th 460, 471 [99 Cal.Rptr.2d 688]; In re Joseph P. (2006) 140 Cal.App.4th 1524, 1529-1530 [45 Cal.Rptr.3d 591]; In re Elizabeth W. (2004) 120 Cal.App.4th 900, 906 [16 Cal.Rptr.3d 514]; In re Nikki R. (2003) 106 Cal.App.4th 844, 853 [131 Cal.Rptr.2d 256]; Kahlen W., supra, 233 Cal.App.3d at p. 1422.) Some reviewing courts have continued to use "reason to believe" as the threshold for ICWA notice. (See, e.g., In re Z.N. (2009) 181 Cal.App.4th 282, 298 [104 Cal.Rptr.3d 247]; In re J.B. (2009) 178 Cal.App.4th 751, 759 [100 Cal.Rptr.3d 679]; In re Alice M. (2008) 161 Cal.App.4th 1189, 1195 [74 Cal.Rptr.3d 863].)

Under the state ICWA act, notice provisions are invoked if the court has "reason to know" the child is an Indian child. (See also §§ 224.2, subd. (a), 224.3, subds. (b), (c), (d).) We presume the Legislature was aware of the more flexible standard in the Guidelines and prior appellate cases when it enacted legislation concerning ICWA notice requirements. (Cf. People v. Roberts (2010) 184 Cal.App.4th 1149, 1180 [109 Cal.Rptr.3d 736]; People v. Strohl (1976) 57 Cal.App.3d 347, 359-360 [129 Cal.Rptr. 224].) Further, the Judicial Council adopted "reason to know" in court rules concerning ICWA notice, modifying an earlier rule that provided notice if the court had "reason to believe" the child was an Indian child. (Cal. Rules of Court, rules 5.481(a)(5)(A), (b)(1), 5.482(a)(1); Cal. Rules of Court, former rule 1439(f)(5), amended and renumbered, eff. Jan. 1, 2007; see In re Aaron R. (2005) 130 Cal.App.4th 697, 707 [29 Cal.Rptr.3d 921].) (Further rule references are to the Cal. Rules of Court.) For these reasons, we believe the more restrictive "reason to know" standard in notice provisions under ICWA and the state act applies when the court considers whether the family's circumstances indicate the child is an Indian child.
[5] "These circumstances include when (1) a party, tribe, or agency informs the court that the child is an Indian child; (2) a state-licensed agency involved in child-protection services discovers information suggesting the child is an Indian child; (3) the child gives the court reason to believe the child is an Indian child; (4) the residence of the child, biological parent, or Indian custodian is known to be a predominantly Indian community; and (5) an officer of the court involved in the proceeding has knowledge the child may be an Indian child. See Guidelines, 44 Fed.Reg. at 67,586, par. B.1(i)[c] through (v)." (In re T.A. (2008) 378 Ill.App.3d 1083, 1090 [318 Ill.Dec. 408, 883 N.E.2d 639].)
[6] For purposes of this discussion, we assume the court and social worker have met their obligations under section 224.3, subdivision (a), to inquire whether a child is or may be an Indian child, and have obtained, where available, all pertinent information concerning the circumstances set forth in section 224.3, subdivision (b), and any other circumstance that may be relevant to the possible Indian status of the child.
[7] The lack of a biological relationship to a tribal member does not preclude ICWA notice. A tribe may make an exception for an adopted child of a member or potential member of the tribe. (In re B.R. (2009) 176 Cal.App.4th 773, 784-785 [97 Cal.Rptr.3d 890]; see In re Antoinette S. (2002) 104 Cal.App.4th 1401, 1408 [129 Cal.Rptr.2d 15].)
[8] The definition of "reason to know" adopted by the California Supreme Court in tort cases is instructive. "[A] `reason to know' standard does not require proof that a person must have inferred the existence of the ultimate fact but only, under the circumstances described above, that a person would have inferred the existence of the ultimate fact or would have regarded the existence of the ultimate fact as so highly probable as to have behaved in conformity with that belief." (Doe v. City of Los Angeles (2007) 42 Cal.4th 531, 547 [67 Cal.Rptr.3d 330, 169 P.3d 559], original italics; see John B. v. Superior Court (2006) 38 Cal.4th 1177, 1191 [45 Cal.Rptr.3d 316, 137 P.3d 153].)