2011 UT App 398

**STATE of Utah, in the interest of M.J. and S.J., persons under eighteen years of age.**

**J.J. and A.J., Appellants,**

v.

**State of Utah, Appellee.**

**No. 20090675–CA.**

Court of Appeals of Utah.

Nov. 25, 2011.

Rehearing Denied Dec. 28, 2011.

Michael D. Olsen and McKette H. Allred, Castle Dale, for Appellants.

Mark L. Shurtleff and John M. Peterson, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian ad Litem.

Before Judges DAVIS, ORME, and ROTH.

## OPINION

ORME, Judge:

¶ 1 A.J. and J.J. (Mother and Father, respectively) appeal the juvenile court's order terminating their parental rights in M.J. and S.J. (the Children). On appeal, Mother and Father argue that the juvenile court erred in determining that it did not have "reason to know" that the Children were Indian children under the Indian Child Welfare Act (ICWA), 15 U.S.C. §§ 1901–63 (2006), and that ICWA, therefore, did not apply in this case; that the evidence was insufficient to justify termination of their parental rights; and that the juvenile court committed plain error by failing to follow the proper procedure when ordering the Children to be removed. We affirm.

## BACKGROUND

¶ 2 Mother and Father are the biological parents of the Children. The Children were both born prematurely. M.J., as a result, has had significant medical problems throughout her life.[1] In April 2008, the Division of Child and Family Services (DCFS) received a referral of physical neglect and child endangerment against Mother. Following an investigation, DCFS discovered that eleven-month-old M.J. weighed only ten pounds and had not gained weight in months, suffered from a twisted-neck condition known as torticollis, and had deteriorating health "due to a lack of follow through" by Mother. DCFS also learned in early May 2008 that both Children had failed hearing exams during a visit to the doctor's office. During the visit, the doctor also expressed concern about the Children's hygiene, as they appeared dirty and had severe diaper rash. The doctor also reported that he had prescribed antibiotics to the Children for ear infections but that Mother had failed to fill—let alone administer—the prescription as directed. Based on these findings, DCFS filed a Verified Petition for Protective Supervision Services in May 2008 alleging that the Children were abused and/or neglected.

¶ 3 At a May 22, 2008 pretrial hearing, Mother and Father claimed that they had joined an Indian tribe. Instead of identifying the particular tribe they had joined, Mother and Father indicated that they were members of the Oklevueha Native American Church. The court ordered Mother and Father to provide valid documentation or other proof of any tribal affiliation within five days.

---

1. In her short life, M.J. has been diagnosed with pulmonary hypertension, cardiomegaly, conges-tive heart failure, obstructive sleep apnea, failure to thrive, developmental delay, and acid reflux.

In response, Mother and Father provided only their Oklevueha Native American Church membership cards.

¶4 In July 2008, after mediation with DCFS, Mother and Father stipulated to findings of fact, conclusions of law, and an order from the juvenile court. While the findings recognized Mother and Father's significant domestic violence and substance abuse issues, the juvenile court's primary focus was Mother and Father's consistent neglect of the Children's medical needs, with their failure to meet M.J.'s needs comprising the bulk of the findings. Pursuant to Mother and Father's stipulation, the juvenile court adjudicated the Children as abused and/or neglected. The juvenile court then placed the Children under DCFS's protective supervision. The court also imposed a Child and Family Plan requiring Mother and Father to complete a domestic violence treatment program, undergo drug testing, take M.J. to her doctor appointments, comply with doctors' orders concerning M.J.'s medical care, and maintain stable employment.

¶5 In November 2008, the juvenile court held a review hearing. At the hearing, Mother and Father entered into stipulated findings regarding their failure to comply with the Child and Family Plan and the court's other orders. The juvenile court scheduled another review hearing for December 2008 and expressly warned Mother and Father that the consequence of noncompliance with the Child and Family Plan and the court's orders would be an order for removal of the Children.

¶6 One month later at the December 2008 review hearing, after hearing testimony from both Mother and Father, the juvenile court determined that Mother and Father had demonstrated "substantial non-compliance from the very beginning" with the Child and Family Plan and the court's orders. The court then decided to remove the Children from Mother and Father's custody, emphasizing that the decision was based on Father's prescription drug abuse and Mother and Father's demonstrated inability to meet M.J.'s medical needs. Accordingly, the court found it in the Children's best interests to end protective supervision services and place them in the full custody of DCFS. The court further ordered that there would be no reunification services and that DCFS should file a petition to terminate Mother's and Father's parental rights within forty-five days. In the interim, Mother and Father were permitted weekly visits with the Children.

¶7 In March 2009, Mother and Father asserted that they were members of the Oglala Sioux Tribe because they were members of the Oklevueha Native American Church. Mother and Father were specifically asked to provide verification of their claimed membership in the Oglala Sioux Tribe because, DCFS informed Mother and Father, the Oglala Sioux Tribe membership rules require an individual to have blood heritage to be a member of the Tribe. Despite being informed of this requirement, Mother and Father provided no verification of their alleged tribal membership and made no claim they had any blood heritage in the Oglala Sioux Tribe.

¶8 In June 2009, the juvenile court held a termination trial. At trial, Mother and Father continued to assert that they were members of the Oglala Sioux Tribe based on their membership in the Oklevueha Native American Church. In their initial round of testimony, neither Mother nor Father claimed that they had any Indian ancestry. Father even specifically testified that he did not have Indian ancestry. Mother and Father did produce, however, a letter purportedly from the Oglala Sioux Tribe, written on Oklevueha Native American Church letterhead, which appeared to contain tribal enrollment numbers for Mother and Father. During a recess, Mother's and Father's attorneys, in the presence of DCFS workers, called the Oglala Sioux Tribe to verify the enrollment numbers found in the letter. A representative of the Oglala Sioux Tribe informed Mother's and Father's attorneys that the letter was not from the Tribe and that the supposed enrollment numbers were in no way affiliated with the Tribe.

¶9 During a second round of testimony, Mother asserted for the first time that she and the Children had Indian blood and were "federally recognized" in the Oglala Sioux Tribe. She further declared that she and the

Children did not have to be formally recognized as members of the Tribe because, she claimed, they could "be part of it if [they] want[ed] to because [they] have Native American blood." Nevertheless, based on Mother and Father's failure to provide documentation of tribal enrollment, the juvenile court found that the Children and their parents are not "eligible for membership in a federally recognized Native American Tribe" and that ICWA therefore did not apply to the proceedings.

¶ 10 In its subsequent order, the court also made extensive findings of fact regarding Mother's and Father's fitness as parents. The juvenile court noted Mother and Father's history of failure to provide for the medical needs of the Children, particularly focusing on M.J.'s significant medical problems that Mother and Father had not properly addressed. The juvenile court also found that Mother and Father had not exhibited improvement in their ability to care for the Children. Specifically, it found that at trial, Father "was unable to demonstrate a reasonable understanding of [M.J.'s] medical needs" and had an immature attitude about parenting in general. Further, the court found that while Mother's testimony demonstrated a "fair understanding" of M.J.'s medical needs, her past actions indicated otherwise. Indeed, the court found that Mother had repeatedly ignored advice from medical professionals regarding care of the Children, as she "just did what [she] felt was best" for the Children.

¶ 11 The juvenile court also noted that Mother and Father had a history of domestic violence and substance abuse and had failed to complete treatment programs for these problems prior to the termination hearing. Additionally, the juvenile court found that Mother and Father had extensive criminal histories, including pending DUI charges for Mother and outstanding warrants for Father at the time of the trial. Finally, the court noted that Mother and Father had failed to provide the stable home environment that the Children needed, especially the high-risk M.J. Based on these findings, the juvenile court concluded that multiple grounds existed for terminating Mother's and Father's

parental rights including abuse and/or neglect, unfitness or incompetence, failure of parental adjustment, and "token efforts."

¶ 12 Additionally, the court found that since the Children had been placed in foster care, they had thrived. Notably, M.J. had gained weight, learned to walk, and received regular medical attention. Further, the court found that since being removed from Mother and Father, the Children had benefitted from being in a stable home where they received love, nurturing, and proper medical care. Thus, the court determined that it was in the best interest of the Children to terminate Mother's and Father's parental rights. Accordingly, because grounds for termination existed and termination was in the Children's best interest, the court terminated Mother's and Father's parental rights.

¶ 13 Mother and Father appealed the juvenile court's order terminating their parental rights. On appeal, Mother and Father alleged that the juvenile court erred in determining that ICWA did not apply in this case. In light of the appeal, DCFS sent notice to the Oglala Sioux Tribe in September 2009, alerting the Tribe to the possibility that the Children were Indian children under ICWA. The Oglala Sioux Tribe responded, indicating that based on its review of enrollment records, the Children were not members of the tribe, nor were they eligible to become members of the tribe because Mother and Father were not enrolled members of the tribe.

¶ 14 In April 2010, this court issued a temporary remand order, directing the juvenile court to determine (1) whether the Children were "Indian children" under ICWA, (2) whether the testimony of Mother and Father at the termination hearing was sufficient to give the court "reason to know that an Indian child [was] involved," and (3) whether the provisions of ICWA apply in this case.

¶ 15 Before the remand hearing, DCFS sent notice pursuant to ICWA to the Secretary of the Interior and the Bureau of Indian Affairs (the BIA). DCFS specifically asked the BIA whether, according to its records, Mother and Father were members or eligible to become members of any Indian tribe. In its response, the BIA indicated that no fur-

ther action was necessary by DCFS because it had already provided appropriate notice of the proceeding to the Oglala Sioux Tribe.

¶ 16 Subsequently, a DCFS worker called the BIA seeking further guidance about the Children's potential Indian child status. Specifically, the DCFS worker asked whether the Children could be affiliated with any Indian tribe because Mother had claimed Indian ancestry during the proceedings. The BIA representative indicated that if a parent does not identify the tribe to which he or she belongs, tribal status cannot be determined by anyone, including the BIA. DCFS sent a letter outlining the concerns raised in the phone call. The BIA responded that without information about Mother's ancestry, the BIA had insufficient information to determine tribal affiliation and therefore could not send ICWA notice to any tribe to resolve the issue.

¶ 17 At the remand hearing, Mother, through counsel, asserted that she had never claimed actual membership in the Oglala Sioux Tribe, but only a "spiritual affiliation" with it. Mother further testified that she believed she had Indian blood because of stories she heard as a child about her father's side of the family. Mother could not identify, however, a particular tribe to which her father's family may have belonged. Mother asserted that she had been working with a genealogist to research her ancestry but had yet to discover any Indian heritage. Mother also indicated that a blood test could reveal her Indian heritage but acknowledged that she had completed no such test by the time of the hearing.

¶ 18 The juvenile court determined that Mother's claims of Indian heritage were not credible because they had continually changed throughout the proceedings. Likewise, the court found that Mother and Father had been repeatedly ordered over the course of two years to produce evidence of tribal affiliation but had failed to do so. The court also noted that despite Mother's claims

of Indian ancestry, she had taken no steps to confirm that she had Indian blood. Accordingly, the juvenile court concluded that Mother's and Father's testimony, both at the termination hearing and at the hearing on temporary remand, was not sufficient to give the juvenile court "reason to know that an Indian child [was] involved" in the proceedings. As a result, the court concluded that ICWA did not apply in this case.[2]

## ISSUES AND STANDARDS OF REVIEW

¶ 19 Mother and Father first contend that the juvenile court incorrectly determined that it did not have "reason to know" that the Children were Indian children under ICWA. Mother and Father do not challenge the juvenile court's findings of fact, and thus, we need only address the juvenile court's interpretation of ICWA and its application to the facts of this case. In doing so, we review the juvenile court's conclusions of law for correctness and afford the juvenile court "some discretion in applying the law to the facts." *In re C.D.*, 2008 UT App 477, ¶ 7, 200 P.3d 194 (citation and internal quotation marks omitted), *cert. dismissed*, 2010 UT 66, 245 P.3d 724.

¶ 20 Next, Mother and Father argue that the evidence was insufficient to support termination of their parental rights. We afford a juvenile court's decision to terminate parental rights "a high degree of deference." *See In re B.R. (In re B.R. II)*, 2007 UT 82, ¶ 12, 171 P.3d 435. Thus, "to overturn the juvenile court's decision '[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made.' " *Id.* (citation omitted).

¶ 21 Finally, Mother and Father contend that the juvenile court committed plain error by failing to follow the proper procedure when it decided at the December 2008 hearing to remove the Children. To estab-

---

**2.** Mother and Father moved this court to strike the order the juvenile court entered following our temporary remand on the grounds that (1) the order contained inappropriate information, (2) the juvenile court relied on inadmissible and deficient "newly discovered evidence" in the

form of the Oglala Sioux Tribe's and the BIA's responses to the notices sent by DCFS, and (3) the juvenile court had abused its discretion by adjudicating the Children's tribal membership. In a prior order, we rejected Mother and Father's motion to strike.

lish plain error, Mother and Father must demonstrate that "(i) [a]n error exists; (ii) the error should have been obvious to the [juvenile] court; and (iii) the error [was] harmful," i.e., prejudicial. *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

## ANALYSIS

### I. ICWA

■ ¶ 22 Mother and Father first argue that the trial court erred in concluding that it did not have "reason to know" that the Children were Indian children and, therefore, that ICWA did not apply to these proceedings. We conclude the juvenile court did not err.

¶ 23 Because of the alarming number of Native American children being removed from their homes by state entities based largely on incorrect perceptions of Native American child-rearing practices, Congress passed ICWA in 1978. ICWA was enacted "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902 (2006). *See* B.J. Jones et al., The Indian Child Welfare Act Handbook 1–3 (2d ed. 2008); *In re Adoption of A.B.*, 2010 UT 55, ¶ 32, 245 P.3d 711.

¶ 24 Key to ICWA's statutory scheme is the requirement that an interested Indian tribe be allowed to intervene in a child custody proceeding involving an "Indian child." *See* 25 U.S.C. § 1911(c). A tribe is unable to intervene and protect its rights under ICWA, however, unless the tribe is aware of the child custody proceeding. Thus, ICWA provides that in any involuntary child custody proceeding in a state court "where the court knows or has *reason to know* that an Indian

child is involved," the State must notify the child's tribe of the pending proceeding and its right to intervene.[3] *Id.* § 1912(a) (emphasis added). Failure to comply with this notice requirement may invalidate the proceedings. *See id.* § 1914 (providing that a parent, Indian custodian, or tribe can petition the court for invalidation of a child custody proceeding that violates ICWA).

¶ 25 Whether a child is an Indian child under ICWA is not necessarily based on ancestry. Instead, ICWA defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4). The ultimate determination of whether a child is a member or eligible to become a member of a particular tribe is the prerogative of that tribe.[4] *See In re X.H.*, 138 P.3d 299, 304 (Colo.2006). Nevertheless, whether a court has "reason to know" that a child is an Indian child "necessarily arises preliminary to an ultimate determination" of a child's Indian status. *Id.* at 302.

■ ¶ 26 As is true generally where a party seeks the benefits afforded by a civil statute, the party asserting the applicability of ICWA has the burden of producing evidence from which the court will have "reason to know" that an Indian child is involved in the proceedings. *See In re A.G.-G.*, 899 P.2d 319, 322 (Colo.Ct.App.1995); *In re C.N.*, 196 Ill.2d 181, 256 Ill.Dec. 788, 752 N.E.2d 1030, 1044 (2001); *In re Trever I.*, 973 A.2d 752, 758 (Me.2009). *See also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008) (explaining that the party seeking the benefit of a law has the burden of proof on that point). Nevertheless, most courts have considered the "reason to know" standard to be a low bar to ICWA applicability. *See, e.g., In re*

---

**3.** If the court has reason to know that a child is an Indian child but the child's tribe cannot be determined or located, the State must give notice to the Secretary of the Interior. *See* 25 U.S.C. § 1912(a) (2006).

**4.** Federally recognized tribes have autonomy to determine the precise requirements for membership and membership eligibility. This calcula-

tion can, but does not always, take into account an individual's ancestry. Accordingly, Indian ancestry is not necessarily the linchpin of tribal membership, although for some tribes, Indian ancestry in that particular tribe may be sufficient. *See In re X.H.*, 138 P.3d 299, 304 (Colo. 2006).

*Antoinette S.*, 104 Cal.App.4th 1401, 129 Cal. Rptr.2d 15, 21 (2002). Likewise, the United States Supreme Court has made clear that because of the important relationship between the federal government and Indian tribes, state law should be "construed liberally in favor of [Indian interests], with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). Nevertheless, the "reason to know" standard is not meaningless. *See In re Arianna R.G.*, 259 Wis.2d 563, 657 N.W.2d 363, 370 (2003) ("Although ICWA provides broad protections, there are limits to its applicability.").

¶ 27 With these considerations in mind, we turn now to construing the "reason to know" standard in the context of this case.[5] Our goal in interpreting ICWA is to give effect to Congress's intent. *See In re C.D.*, 2008 UT App 477, ¶ 23, 200 P.3d 194, *cert. granted*, 211 P.3d 986 (Utah 2009). To determine Congress's intent with respect to the "reason to know" standard, we look first to the plain language of the statute. *See In re Adoption of A.B.*, 2010 UT 55, ¶ 33 & n. 31, 245 P.3d 711. In reviewing the plain language of ICWA, we assume that Congress used the "reason to know" phrase "advisedly and in accordance with its ordinary meaning." *Houskeeper v. State*, 2008 UT 78, ¶ 21, 197 P.3d 636 (citation and internal quotation marks omitted). If the ordinary "meaning of the language is clear, we need look no further to discern [Congress's] intent." *Id.* We conclude that the ordinary meaning of "reason to know" is clear.

¶ 28 In its ordinary sense, "reason to know" is "[i]nformation from which a person of ordinary intelligence ... would infer that the fact in question exists or that there is a substantial enough chance of its existence that, if the person exercises reasonable care, the person can assume the fact exists." *Black's Law Dictionary* 1381 (9th ed. 2009). Applying this language to the "reason to know" standard found in ICWA, we conclude that before a court has "reason to know" that an Indian child is involved in the proceedings, the party asserting that ICWA applies

---

5. We note that courts have struggled to apply the provisions of ICWA consistently. *See In re C.D.*, 2008 UT App 477, ¶ 9 & n. 4, 200 P.3d 194 (noting splits in authority among courts when applying the provisions of ICWA), *cert. granted*, 211 P.3d 986 (Utah 2009). This is particularly true of the "reason to know" standard. *See In re Arianna R.G.*, 259 Wis.2d 563, 657 N.W.2d 363, 372 (2003). Neither ICWA nor Utah law defines "reason to know" in the context of determining whether ICWA's notice provisions are triggered. Accordingly, this is an issue of first impression in Utah.

To aid states in interpreting and applying ICWA, the BIA has issued guidelines. *See* Guidelines for State Courts; Indian Child Custody Proceedings (the Guidelines), 44 Fed. Reg. 67,584 (Nov. 26, 1979). The primary responsibility for interpreting ICWA, however, rests with state and tribal courts, and thus, the Guidelines, while important, are not controlling. *See id.* ("Where ... primary responsibility for interpreting [ICWA] rests with the courts, [the BIA's interpretations] are given important but not controlling significance."). *See also In re C.D.*, 2008 UT App 477, ¶ 14 n. 7, 200 P.3d 194 (indicating that the Guidelines are not binding but acknowledging that they are helpful in interpreting ICWA). Accordingly, courts are "free to act contrary to what the [BIA] has said if they are convinced that the [BIA] guidelines are not required by the statute itself." The Guidelines, 44 Fed. Reg. at 67,584.

The Guidelines contain a variety of occurrences that, according to the BIA, are sufficient to trigger ICWA's notice provisions. *See id.* at 67,586; 67,589. Without explanation, the Guidelines employ the "reason to believe" rather than the more exacting "reason to know" standard as the trigger to ICWA applicability. *See id. See also In re Skyler H.*, 186 Cal.App.4th 1411, 112 Cal.Rptr.3d 892, 900 n. 4 (2010) (recognizing that "reason to believe" is "more flexible" than "reason to know"), *review denied but depublished by*, 2010 Cal. LEXIS 11411; *In re Trever I.*, 973 A.2d 752, 757 (Me.2009) (noting that the Guidelines "depart[] inexplicably" from the "reason to know" standard in ICWA); *In re Arianna R.G.*, 657 N.W.2d at 370 n. 18 (explaining that because the Guidelines are not binding, the court would use the "reason to know" standard rather than "reason to believe"). Although we recognize that the Guidelines are helpful in determining whether the notice provision was triggered, *see In re C.D.*, 2008 UT App 477, ¶ 14 n. 7, 200 P.3d 194, we do not adopt the "reason to believe" standard because we are convinced that the plain language of the statute requires use of the somewhat more demanding "reason to know" standard. Thus, even if the facts of this case seem to qualify as a notice-triggering event under the Guidelines, this is not necessarily determinative of whether the juvenile court had "reason to know" that the Children were Indian children under ICWA, as Mother and Father argue.

must produce sufficient evidence for a person of ordinary intelligence to infer that a child is either (a) a member of an Indian tribe or (b) eligible to become a member of an Indian tribe and the biological child of a member of an Indian tribe. *See In re Skyler H.,* 186 Cal.App.4th 1411, 112 Cal.Rptr.3d 892, 901–02 (Cal.Ct.App.2010) (applying the *Black's Law* definition of "reason to know" in the ICWA context), *review denied but depublished by,* 2010 Cal. LEXIS 11411.

¶ 29 Although the ordinary meaning of the term "reason to know" is clear, this is not to say that applying it in a particular case is a straightforward process. Indeed, the "reason to know" standard requires courts to look to the totality of the circumstances of each case to determine whether a court had "reason to know." *See id.,* 112 Cal.Rptr.3d at 902. We agree with the Colorado Supreme Court that

> [p]recisely what constitutes "reason to know"... in any particular set of circumstances will necessarily evade meaningful description. As in other contexts, ["reason to know"] must depend upon the totality of the circumstances and include consideration of not only the nature and specificity of available information but also the credibility of the source of that information and the basis of the source's knowledge.

*In re X.H.,* 138 P.3d 299, 303 (Colo.2006). *See also In re Trever I.,* 973 A.2d at 759 (same); *In re Arianna R.G.,* 657 N.W.2d at 373 (indicating that whether ICWA's notice provisions apply is a "fact sensitive" inquiry). *Cf. H.U.F. v. W.P.W.,* 2009 UT 10, ¶¶ 36–38, 203 P.3d 943 (undertaking a fact-sensitive inquiry in determining whether a putative father had "reason to know" that a birth mother lived in Utah); *Geneva Pipe Co. v. S & H Ins. Co.,* 714 P.2d 648, 652 (Utah 1986) (indicating that whether one party had "reason to know" that another party had a duty to perform was a factual issue).

¶ 30 Mother and Father contend, however, that ICWA applicability does not depend on the credibility of the evidence produced by the party asserting Indian child status. Spe-cifically, Mother and Father suggest that a credibility determination regarding an assertion of Indian heritage is inappropriate. Indeed, Mother and Father claim that "only a suggestion of Indian ancestry [is necessary] to trigger [ICWA's] notice requirement." We note that some courts have determined that because tribal membership may be based on blood quantum, a mere assertion of Indian ancestry is sufficient to invoke the provisions of ICWA. *See In re X.H.,* 138 P.3d at 303–04 (listing cases where courts have either directly or indirectly relied on a mere hint or suggestion of Indian ancestry in determining that ICWA's notice provisions applied).

¶ 31 We conclude, however, that while the bar to ICWA applicability is low, *see supra* ¶ 26, a reasonable person would not necessarily infer from a mere hint or suggestion of Indian heritage, without more, that a child is an Indian child under ICWA. Instead, before a hint or suggestion of Indian ancestry is sufficient to constitute "reason to know," the assertion must be "sufficiently reliable" and support a low but reasonable probability that a child is a member of an Indian tribe or eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe. *See id.* at 304; *In re Skyler H.,* 112 Cal.Rptr.3d at 902. Consequently, we agree with the many courts that have determined that vague, unsupported, last-minute, or incredible assertions of Indian ancestry are not sufficient to invoke ICWA's notice provisions.[6] *In re Skyler H.,* 112 Cal.Rptr.3d at 902 (holding that an attenuated claim of Indian heritage was not sufficient to give the court "reason to know"); *In re A.G.–G.,* 899 P.2d 319, 322 (Colo.Ct.App.1995) ("[A]lthough mother and father informed their caseworker and also testified that each had Indian heritage in the Sioux or Blackfoot Indian tribes, nothing in the record established their or the child's membership or eligibility for membership in any tribe."); *In re Trever I.,* 973 A.2d 752, 759–60 (Me.2009) (concluding that the "father did not meet his burden of producing sufficient information" of Indian child status

***

**6.** We wish to make clear, however, that in the majority of cases, because of the important interests involved "it is better to err on the side of giving notice." *In re R.E.K.F.,* 698 N.W.2d 147, 149 (Iowa 2005).

where father provided nothing more than a "vague, last minute, allegation of 'Cherokee background'"); *In re Johanson*, 156 Mich. App. 608, 402 N.W.2d 13, 16 (1986) ("The fact that [the child] may have Indian heritage does not qualify him as an Indian child under [ICWA]."); *In re Guardianship of J.O.*, 327 N.J.Super. 304, 743 A.2d 341, 347 (N.J.Super.Ct.App.Div.2000) (indicating that an "amorphous" statement of Indian heritage was not sufficient to trigger ICWA's notice requirement); *In re A.L.*, 623 N.W.2d 418, 422 (N.D.2001) (holding that "counsel's unsupported and vague statements" of a child's Indian heritage were insufficient to invoke ICWA); *In re Arianna R.G.*, 259 Wis.2d 563, 657 N.W.2d 363, 370–73 (2003) (holding that a party's vague assertion of Chippewa ancestry and failure to provide complete and accurate information to the court did not put the court on notice that the children were Indian children).

¶ 32 Our decision to require more than a mere assertion of Indian ancestry is also influenced by the strict statutory timelines for child permanency proceedings. *See* Utah Code Ann. §§ 78A–6–312, –314. (Supp. 2010). Allowing mere assertions of Indian ancestry to invoke ICWA would be subject to abuse by parties seeking to delay a permanency order, thereby delaying finalization of a child's permanency plan. While ICWA indeed prevails over state law in certain instances, "ICWA was not a complete repudiation of the state laws and procedures applicable to" child custody proceedings. *In re C.D.*, 2008 UT App 477, ¶ 14, 200 P.3d 194, *cert. granted*, 211 P.3d 986 (Utah 2009). Accordingly, requiring more than vague assertions of Indian heritage comports with the ordinary meaning of ICWA and preserves, to the extent possible, our statutory scheme for child permanency.

¶ 33 Here, Mother and Father's assertions regarding their Children's Indian child status continually changed throughout the proceedings and were also irrelevant, incredible, and vague. Thus, we have no trouble concluding that Mother and Father did not produce sufficiently reliable evidence that would prompt a person of ordinary intelligence to infer that the Children were Indian children.

¶ 34 Mother and Father's initial claims that they were affiliated with an Indian tribe were irrelevant to a determination of Indian child status under ICWA. Mother and Father first claimed that the Children were Indian children by virtue of the family's membership in the Oklevueha Native American Church. Ten months later, Mother and Father's claim had evolved into an assertion that they were members of the Oglala Sioux Tribe by virtue of their membership in the Oklevueha Native American Church. The Oklevueha Native American Church is not a federally recognized tribe, and thus, membership in it, without more, does not confer Indian child status on the Children. *See generally State v. Mooney*, 2004 UT 49, 98 P.3d 420 (determining whether the use of peyote in the Oklevueha Native American Church was legal given that the church is not an Indian tribe recognized by the BIA); Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 75 Fed. Reg. 60,810–14 (Oct. 1, 2010) (listing federally recognized tribes without mentioning the Oklevueha Native American Church). Additionally, although there are many criteria upon which tribal affiliation may be based, *see In re X.H.*, 138 P.3d 299, 304 (Colo.2006), we see no indication that membership in the Oklevueha Native American Church is one of them. This is particularly true in relation to the Oglala Sioux Tribe. The Oglala Sioux Tribe's membership rules make blood heritage—not religious affiliation—the touchstone for membership in the tribe.[7] Accordingly, Mother's and Father's claims to membership in the Oklevueha Native American Church are irrelevant to determining whether the Children were members or eligible to become

---

7. Mother and Father claim the juvenile court erred in reviewing documentary evidence concerning the Oglala Sioux Tribe's membership rules. Nevertheless, Mother and Father waived objection to the admission of these documents, and thus, we do not address this argument. *See* Utah R. Evid. 103(a)(1) (stating that to find error in an evidentiary ruling, a "timely objection or motion to strike" must appear in the record).

members of the Oglala Sioux Tribe.[8]

¶ 35 Furthermore, Mother's and Father's claims that the Children had Indian child status at the termination hearing were not sufficiently reliable, given that they evolved throughout the hearing and were based on vague, incredible, and unsupported assertions of Indian blood heritage. At the termination hearing, Mother and Father initially asserted, as they had previously, that they were members of the Oglala Sioux Tribe based on their Oklevueha Native American Church membership. In support of their claim, Mother and Father produced a letter, purportedly from the Oglala Sioux Tribe, confirming their membership and listing their tribal enrollment numbers. After an investigation, Mother's and Father's own counsel discovered that this letter was not from the Oglala Sioux Tribe, and it contained no information supporting Mother's and Father's claims of tribal membership. And, as already noted, the Oglala Sioux Tribe had previously disclaimed any connection between the Children and the tribe.

¶ 36 Mother then claimed, during her second round of testimony at the termination hearing, that she had Indian ancestry. This was the first instance in over a year of involvement with DCFS that either Mother or Father even hinted at having Indian ancestry. While we agree that claims of Indian ancestry do not necessarily have to be raised at a specific stage of the proceedings, *see In re Marinna J.*, 90 Cal.App.4th 731, 109 Cal. Rptr.2d 267, 271–73 (2001) (holding that ICWA applicability can be raised any time), the timing and changing nature of Mother's claim are nevertheless relevant to determining whether Mother's assertion was sufficiently credible. The issue of Mother's and Father's membership in the Oglala Sioux Tribe came up several times during DCFS's initial investigation. DCFS, the guardian ad litem, and an assistant attorney general repeatedly informed Mother and Father that membership in the Oglala Sioux Tribe re-

quired blood heritage. Nevertheless, Mother did not claim Indian ancestry until the termination hearing was well underway. Indeed, up to the time of her second round of testimony at the termination hearing, Mother had only ever claimed membership in the Oglala Sioux Tribe based on her membership in the Oklevueha Native American Church. Thus, the timing of Mother's claim suggests that her assertion of Indian ancestry was merely a last-minute attempt to delay the proceedings. Accordingly, the juvenile court appropriately discounted the credibility of Mother's claim. *See In re Trever I.*, 973 A.2d 752, 759–60 (Me.2009) (holding that a vague, last-minute assertion of Indian ancestry was not sufficiently reliable to trigger ICWA applicability).

¶ 37 Further, despite being requested to do so, Mother failed to provide any support for her claim of Indian ancestry. Instead, she merely declared broadly:

> Me and [the Children] have Indian in us.... We are part of the ... Oglala Lakota Sioux Nation. We are in that Tribe, and we are federally recognized in that Tribe. Me and [the Children] have Native American blood in us, and we don't have to be adopted into the Tribe. We can be part of it if we want to.

While actual proof of Indian blood heritage is not required, without any further detail or documentation supporting her claim, Mother's assertion of Indian ancestry is vague and uncertain. As a result, we see no error in the juvenile court's conclusion at the termination trial that Mother's assertion did not constitute "reason to know" that the Children were Indian children. *See In re Arianna R.G.*, 259 Wis.2d 563, 657 N.W.2d 363, 372 (Wis.2003) (holding that a party's vague assertion of Chippewa ancestry and failure to provide complete and accurate information did not give the court "reason to know").

¶ 38 Mother's basis for her claim of Indian ancestry changed again at the hearing on remand. Specifically, Mother claimed

8. Generally, while membership in the Oklevueha Native American Church may provide "reason to know" that a person has an affinity for Native American spirituality, because the Oklevueha Native American Church is open to individuals of all backgrounds, *see* Oklevueha Native American Church, http://www.nativeamericanchurches.org/nativeamericanchurch (last visited Nov. 18, 2011), membership in the church alone does not provide "reason to know" that a child is a member or eligible to become a member of any Indian tribe.

through counsel that she had never asserted actual membership, only "spiritual affiliation" with the Oglala Sioux Tribe, contrary to her testimony at the termination hearing. Mother then repeated her claim of Indian ancestry, indicating that she believed her Indian heritage came from her father's side of the family based on stories she had heard as a child. Nevertheless, despite the additional time afforded Mother by the remand, she did not indicate to which tribe her father's ancestors may have belonged, nor did she produce any additional evidence to support her claim of Indian ancestry. She did claim that she was working with a genealogist to trace her family history and indicated that a blood test could potentially lead to a determination of Indian blood heritage. Yet, as of the remand hearing, Mother's genealogical research had yielded no records supporting her claim and she had not taken or arranged to take a blood test. Thus, on remand, the evidence produced by Mother consisted of an evolving claim of tribal membership based on her attorney's contradictory proffer and attenuated claims of Indian ancestry based on vague family stories,[9] fruitless genealogical research, and nonexistent blood testing. Despite the low bar to ICWA applicability, we cannot say that, under all the circumstances,

this evidence was sufficiently reliable to give the juvenile court "reason to know" that the Children were Indian children under ICWA.

¶ 39 In sum, although we are careful to note that Mother and Father were not required to produce absolute proof of Indian ancestry, Mother and Father's irrelevant, evolving, incredible, and vague assertions, coupled with the Oglala Sioux Tribe's disavowal, were simply not reliable enough that a person of ordinary intelligence would infer that the Children were either (1) members of an Indian tribe or (2) eligible for tribal membership and the biological children of a member of an Indian tribe. Accordingly, we cannot say the juvenile court erred in determining that it did not have "reason to know" that an Indian child was involved in the proceedings. Thus, the juvenile court was not required to direct that additional notice be given or to apply any other provision of ICWA. We therefore reject Mother and Father's argument that the termination proceedings should be invalidated because of the court's failure to comply with ICWA's notice provisions.[10]

## II.   Sufficiency of the Evidence

■■■ ¶ 40 Mother and Father next contend that the juvenile court's findings were

9. Detailed, credible stories of Indian heritage may be sufficiently reliable to trigger ICWA in some instances. Mother's claim of Indian ancestry at the termination trial was, however, deemed incredible by the juvenile court. And Mother offered little in the way of detail to bolster her claim on remand.

10. In any event, out of an abundance of caution, the State sent notice to the Oglala Sioux Tribe and the BIA prior to the remand hearing. As indicated, the tribe, which had previously advised counsel that the enrollment numbers Mother and Father proffered were unaffiliated with the tribe, responded promptly, indicating that the Children were not members of the tribe and were not eligible to become members of the tribe. Mother and Father contend that the notice sent to the BIA was deficient under ICWA and applicable regulations. We disagree.

Mother and Father first argue that the notice sent by the State was untimely and, therefore, irrelevant to this appeal. We have already rejected this argument in denying Mother and Father's motion to strike portions of the juvenile court's order on remand, and thus, we do not address it further.

Mother and Father also argue that the notice sent to the BIA was deficient as it did not contain

information about the Children's ancestry as required by the federal regulation implementing ICWA's notice provision. See 25 C.F.R. § 23.11 (2010). That regulation requires ICWA notice to contain "[a]ll names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information." Id. § 23.11(d)(3). Nevertheless, this information is only required "if known." Id. § 23.11(d) (emphasis added). DCFS asked Mother and Father to provide support for their assertions of ICWA applicability and the juvenile court repeatedly ordered Mother and Father to provide any relevant information supporting their claims. Despite these requests, Mother and Father "d[id][no]thing to assist [DCFS or the court] with information or documentation" supporting their claims of Indian ancestry. Accordingly, as the information was not known to DCFS, it was not an error for it to send notice that did not contain information about the Children's ancestry. See id.

insufficient to support termination of parental rights. The juvenile court "may terminate all parental rights with respect to a parent if the court finds any one of" the grounds listed in Utah Code section 78A-6-507. *See* Utah Code Ann. § 78A-6-507(1) (2008). We will not overturn a decision to terminate parental rights unless the juvenile court "failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re B.R. II*, 2007 UT 82, ¶ 12, 171 P.3d 435. And "[w]hen a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶ 41 Mother and Father first contend that the evidence was insufficient to support a finding that the Children had been abused or neglected because M.J. had gained roughly the same amount of weight in foster care as she had during a similar length of time while in the custody of Mother and Father. We note that the juvenile court considered in detail M.J.'s weight gain in determining whether she was abused or neglected, as it was required to do. *See id.* ¶ 13. While it may be that a fourteen ounce difference in weight gain is not, in and of itself, a strong indicator of abuse or neglect, the court did not merely consider the net difference in weight gain. The juvenile court found that M.J. experienced a rapid weight increase immediately upon entering foster care, suggesting that M.J. had not been fed adequately prior to entering into foster care. Moreover, evidence also establishes that in addition to her weight gain, M.J.'s overall health improved dramatically once she was placed in foster care. Accordingly, we cannot say that the juvenile court's decision was against the clear weight of the evidence. *See id.*

¶ 42 Next, Mother and Father argue that the juvenile court did not adequately consider their ability to care for the Children at the time of the termination trial. "In termination cases, the juvenile court must weigh a parent's past conduct with [his or] her present abilities." *Id.*[11] "This standard required the juvenile court to consider the totality of the evidence regarding [Mother's and Father's] parenting—all of [their] conduct up to the termination trial." *Id.*

¶ 43 We conclude that the juvenile court appropriately weighed Mother's and Father's prior parental failures with their parental fitness at the time of the termination trial. The juvenile court entered nearly thirty pages of detailed findings outlining Mother's and Father's past unfitness, which Mother and Father concede may have warranted termination. Moreover, contrary to Mother and Father's contention, the juvenile court also explicitly considered Mother's and Father's parental fitness at the time of the termination trial, including their ability to care for the needs of the Children. With respect to Father, the juvenile court found, based on his testimony at trial, that he lacked a complete understanding of how to properly care for M.J. With respect to Mother, the juvenile court found that while Mother expressed in her testimony a "fair" understanding of M.J.'s medical issues, her past actions and attitude at the termination trial suggested otherwise. Specifically, the court noted that Mother had repeatedly ignored the advice of medical professionals and had testified at the termination hearing that she "just did what [she] felt was best" in caring for M.J.'s significant medical needs.

¶ 44 Additionally, the court noted that at the time of the termination trial, Mother and Father faced unresolved domestic violence issues, substance abuse problems, and ongoing criminal troubles. The court further found that by the time of the termination hearing, neither Mother nor Father had done anything to improve their ability to care for the Children. Indeed, the court specifically noted that up to the time of the termination hearing, Mother and Father had been "unwilling to engage in the reasonable services that would make them fit parents," including undergoing treatment for their substance

---

11. Mother and Father rely on *In re B.R.* (*In re B.R. I*), 2006 UT App 354, 144 P.3d 231, to support their claim that the juvenile court failed to acknowledge that they had remedied their parental deficiencies by the time of the termination hearing. *In re B.R. I* was vacated in its entirety by *In re B.R. II*, 2007 UT 82, ¶ 16, 171 P.3d 435, and cannot support Mother and Father's arguments.

abuse and domestic violence issues. While Mother and Father argue that they had "substantially improved their attitude," they point to nothing in the record to support their claim that they had "cured their [parenting] issues" by the time of the termination trial. Thus, in light of the juvenile court's detailed findings of Mother's and Father's past unfitness and its thorough review of Mother's and Father's condition at the time of the termination hearing, including their ability to care for the Children's medical needs, we conclude that the juvenile court appropriately weighed Mother's and Father's present claimed abilities to parent against their past parental unfitness, as it was required to do. *See In re B.R. II*, 2007 UT 82, ¶ 13, 171 P.3d 435.

¶ 45 Furthermore, contrary to their assertion, Mother's and Father's parental rights were not terminated based on their failure to complete the requirements of the Child and Family Plan. Utah Code section 78A–6–507 prohibits a court from terminating parental rights merely because a parent fails to complete a child and family plan. *See* Utah Code Ann. § 78A–6–507(2) (2008). *But see id.* § 78A–6–508(5) (providing that failure to complete a child and family plan is evidence of a failure of parental adjustment). Although the juvenile court noted that Mother and Father failed to complete their Child and Family Plan as directed, in view of the lengthy, detailed findings, which cover much more than failure to complete the Child and Family Plan and support multiple grounds for termination, we reject Mother and Father's assertion that the juvenile court improperly based its decision on Mother's and Father's failure to complete the Child and Family Plan. The same is also true of Mother and Father's assertion that the juvenile court terminated their parental rights because of Mother and Father's "impoverished circumstances."

¶ 46 In sum, we conclude that the juvenile court did not fail to consider all of the evidence, nor can we say that although the juvenile court considered all of the evidence,

its decision to terminate Mother's and Father's parental rights was against the clear weight of the evidence. *See In re B.R. II*, 2007 UT 82, ¶ 12, 171 P.3d 435. Thus, we see no error in the juvenile court's decision to terminate Mother's and Father's parental rights.[12]

### III. Subject Matter Jurisdiction and Due Process

¶ 47 Mother and Father contend that the juvenile court committed plain error by failing to require the filing of a petition seeking removal of the Children at the December 2008 hearing and by failing to follow proper procedure in removing the Children, resulting in a lack of subject matter jurisdiction for the juvenile court and a violation of Mother's and Father's due process rights. We conclude that Mother and Father have not established plain error. *See generally State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993).

¶ 48 We first address Mother and Father's claim of error in the juvenile court's exercise of subject matter jurisdiction. Specifically, Mother and Father contend that the filing of a petition seeking removal of the Children at the December 2008 hearing was necessary before the court could appropriately invoke its subject matter jurisdiction and remove the Children from Mother's and Father's custody. We disagree.

¶ 49 The juvenile court has "exclusive original jurisdiction in proceedings concerning . . . a child who is an abused child, a neglected child, or dependent child." Utah Code Ann. § 78A–6–103(1)(c) (Supp.2011). To invoke the jurisdiction of the court, DCFS—or "any interested person," for that matter—must file a petition alleging that a child has been abused or neglected, or is dependent. *See id.* § 78A–6–304(1) (2008); *In re K.F.*, 2009 UT 4, ¶ 22, 201 P.3d 985. Once the juvenile court has adjudicated the child as falling under its jurisdiction, it has ongoing jurisdiction over that child. *See* Utah Code Ann. § 78A–6–120(1); *In re K.F.*, 2009 UT 4,

¶¶ 22–24, 201 P.3d 985. With this continuing jurisdiction, the court has myriad dispositional choices available to it, *see* Utah Code Ann. § 78A–6–117(2) (Supp.2011), from the minimally intrusive option of protective supervision, *see id.* § 78A–6–117(2)(a)(i), to the more drastic remedy of removal, *see id.* § 78A–6–117(2)(c)(i)(A).

¶ 50 DCFS initiated the proceedings below by filing a verified petition for protective supervision services in May 2008 that alleged the Children were abused and/or neglected. The juvenile court, pursuant to Mother and Father's stipulation, adjudicated the Children as abused and/or neglected at a July 2008 hearing. Thus, from that point forward, the juvenile court had exclusive, continuing subject matter jurisdiction over the Children, *see id.* § 78A–6–120(1) (2008), and it was free to apply any of the dispositional options available to it at the December 2008 hearing. *See id.* § 78A–6–117(2) (Supp.2011). We see nothing in the Juvenile Court Act requiring DCFS to file an additional petition specifically seeking removal prior to the December 2008 hearing in order for the court to exercise its subject matter jurisdiction and remove the Children. Thus, no error existed in the juvenile court's failure to require DCFS to file a petition seeking removal at the December 2008 hearing. Accordingly, we see no error in the juvenile court's exercise of its subject matter jurisdiction in removing the Children.

¶ 51 Mother and Father also contend that the juvenile court did not follow proper procedure because they had no notice that they were in danger of having the Children permanently removed at the December 2008 hearing, and thus, they could not have adequately prepared to defend against it. "Parties to a judicial proceeding are entitled to notice 'that a particular issue is being considered by a court; and must be given' an opportunity to present evidence and argument on that issue before decision." *In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App.1998) (citation omitted). A party has adequate no-

tice if it is advised of "the specific issues which [it] must prepare to meet." *Id.* (citation and internal quotation marks omitted). "[W]here notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him ... a party is deprived of due process." *Id.* (alterations in original) (citation and internal quotation marks omitted).

¶ 52 This argument is not persuasive. Mother and Father had actual notice that removal would potentially be an issue at the December 2008 hearing. Specifically, the juvenile court expressly warned Mother and Father in its order from the November 2008 review hearing that if they did not begin to comply with the Child and Family Plan and the court's other orders, the court would remove the Children at the December 2008 review hearing.[13] Accordingly, Mother and Father should have been keenly aware that their failure to heed the court's warning would result in their having to defend against removal at the December 2008 hearing.

¶ 53 Additionally, Mother and Father had statutory notice that they faced permanent removal of the Children at the December 2008 review hearing. As mentioned above, once the juvenile court adjudicated the Children as abused and/or neglected at the July 2008 hearing, it had continuing jurisdiction over the Children. Pursuant to this jurisdiction, the court could impose any of the dispositional choices available to it at the December 2008 hearing, *see* Utah Code Ann. § 78A–6–312(1)(a), including removal of the Children from Mother's and Father's custody, *see id.* § 78A–6–117(2)(c)(i)(A). Likewise, once the juvenile court determined that removal was appropriate, it had the discretion to end reunification services, *see id.* § 78A–6–312(2)(a)(i)(B), and establish a permanency goal for the Children, *see id.* § 78A–6–312(2)(a)(i)(A). Thus, Mother and Father may properly be deemed to have had statutory notice that they faced removal of the Children, an end to reunification services,

---

**13.** This warning was neither "ambiguous" nor "inadequate to inform" Mother and Father that they were in danger of losing custody of the Children at the December 2008 hearing. *See In re K.M.*, 965 P.2d 576, 579 (Utah Ct.App.1998).

Indeed, the court stated, "[I]f [Mother and Father] do not comply with the requirements of the Child and Family Plan and the recommendations/orders from the [court] today, the children shall be removed from their custody."

and establishment of a permanency plan that could potentially result in permanent deprivation of their rights in the Children.[14] *See In re K.M.*, 965 P.2d at 579 (holding that a mother had "statutory notice that her failure to comply with the service plan could jeopardize her future rights to her children"). Accordingly, given that they had actual and statutory notice that they were in danger of losing custody of the Children, we conclude that Mother and Father were adequately advised of the issues they faced at the December 2008 hearing. Thus, no error in this regard existed.[15]

¶ 54 Mother and Father further contend that the juvenile court failed to provide them with a shelter hearing, adjudication, disposition, and a permanency hearing upon removing the Children. Accordingly, Mother and Father contend that removal was premature. We conclude that Mother and Father have not met their burden of showing plain error on this issue.

■■■ ¶ 55 Mother and Father first claim that they were deprived of a shelter hearing. A shelter hearing is a post-deprivation remedy designed to assure due process in cases where the juvenile court has not asserted jurisdiction at the time of removal or an equivalent event. *See* Utah Code Ann. § 78A–6–306(1) (Supp.2011). A shelter hearing is only required after one of five specific occurrences: (1) removal by DCFS, (2) placement of the child in the protective custody of DCFS, (3) emergency placement pursuant to Utah Code section 62A–4a–202.1(4), (4) a parent's entry into a domestic violence shelter as an alternative to removal, and (5)

filing of a "Motion for Expedited Placement in Temporary Custody." *See id.* § 78A–6–306(1)(a)–(e). None of the events requiring a shelter hearing occurred prior to the December 2008 hearing.[16] In fact, the Children remained in Mother's and Father's custody until the December 2008 hearing. Accordingly, no shelter hearing was required. Instead, as mentioned above, the juvenile court asserted jurisdiction over the Children at the July 2008 hearing and simply exercised that jurisdiction to remove the Children from Mother and Father at the December 2008 dispositional review hearing. *See id.* § 78A–6–312(1)(a).

¶ 56 Mother and Father also argue that they were entitled to an adjudication and a disposition prior to removal of the Children as ordered at the December 2008 hearing. As noted, the juvenile court, pursuant to Mother and Father's stipulation, adjudicated the Children as subject to the court's jurisdiction during the July 2008 hearing. Thereafter, the juvenile court had authority to impose any of the dispositional choices available to it, *see id.*, and it appropriately did so at the dispositional review hearing in December 2008. We see nothing in the Juvenile Court Act requiring that an *additional* adjudication precede the dispositional review hearing. Thus, we see no error in the procedure used by the juvenile court leading up to the December 2008 hearing.

■■■ ¶ 57 Finally, Mother and Father contend that the juvenile court erred by holding a permanency hearing at the same time as the dispositional review hearing. Specifical-

---

**14.** In referring to statutory notice, we do not suggest Mother and Father merely had constructive notice but were in the dark about their rights and obligations as a practical matter. On the contrary, they have been represented by diligent counsel, who has vigorously represented their interests and can reasonably be expected to have advised them of their rights and options under the applicable statutes throughout the pendency of this proceeding.

**15.** We also conclude that Mother and Father were not deprived of their right to confront witnesses and present evidence in their favor. Because we have concluded that Mother and Father had adequate notice that they faced removal of the Children at the December 2008 hearing, and

that this removal could lead to an end of reunification services and a change in the Children's permanency plan, we see no reason why Mother and Father could not have been prepared to defend against permanent removal of the Children through effective examination of witnesses and presentation of evidence.

**16.** Nor did removal in December 2008 trigger a shelter hearing. Removal at the December 2008 review hearing was effected by the juvenile court, not DCFS, *see* Utah Code Ann. § 78A–6–306(1)(a) (Supp.2011), and the Children were placed in the full custody of DCFS, not merely protective custody, *see id.* § 78A–6–306(1)(b). The other occurrences are not even remotely applicable here. *See id.* § 78A–6–306(1)(c)–(e).

ly, Mother and Father argue that the juvenile court should not have determined whether to continue reunification services at the December 2008 review hearing because, they contend, that is to be done at a subsequent permanency hearing. Utah Code section 78A–6–314(1)(b) provides that if the juvenile court ends reunification services at a dispositional review hearing, the court is required to conduct a permanency hearing "within 30 days after the day on which the dispositional hearing ends" to finalize a child's permanency plan. *Id.* § 78A–6–314(1)(b).

¶ 58 The juvenile court determined that no reunification services would be ordered for Mother and Father and established a permanency goal of adoption for the Children at the December 2008 hearing. Thus, it appears that the juvenile court finalized the Children's permanency plan in conjunction with the dispositional review hearing. A permanency plan hearing "is admittedly a 'sequential step' established by the Legislature which cannot be ignored by the juvenile court." *In re K.M.*, 965 P.2d 576, 582 (Utah Ct.App.1998) (citation omitted). Nevertheless, all that is required by the language of the statute is that the permanency hearing occur *no later than* thirty days "after the day on which the dispositional hearing ends." Utah Code Ann. § 78A–6–314(1)(b). *See In re K.M.*, 965 P.2d at 582. Here, the permanency hearing occurred "within 30 days after the day on which the dispositional hearing end[ed]," *see* Utah Code Ann. § 78A–6–314(1)(b), albeit in conjunction with the dispositional review hearing. *See In re K.M.*, 965 P.2d at 582. There is no requirement that the permanency hearing and the dispositional review hearing occur on separate days or be wholly unrelated to one another. *See id.* Thus, we see no error in the juvenile court's decision to finalize the Children's permanency plan when it removed the Children at the December 2008 dispositional review hearing.

¶ 59 We conclude that Mother and Father have not met their burden of establishing plain error. Specifically, they have not demonstrated that any error occurred in connection with the procedure the juvenile court employed leading up to and during the De-cember 2008 dispositional review hearing. *See generally State v. Dunn,* 850 P.2d 1201, 1208–09 (Utah 1993).

CONCLUSION

¶ 60 We conclude that the juvenile court did not err in determining that Mother's and Father's irrelevant, vague, incredible, and evolving claims were not sufficiently reliable to give the court "reason to know" that the Children were either members or eligible to become members of a federally recognized Indian tribe. Accordingly, the court did not err in failing to invoke the provisions of ICWA. Further, we conclude that the juvenile court considered all relevant evidence and properly weighed Mother's and Father's past parental unfitness against their fitness at the time of the termination hearing. Finally, we conclude that Mother and Father did not establish that the juvenile court committed plain error by failing to require a petition seeking removal of the Children at the December 2008 hearing or in following the procedure it did when removing the Children.

¶ 61 Affirmed.

¶ 62 WE CONCUR: JAMES Z. DAVIS, Presiding Judge, and STEPHEN L. ROTH, Judge.